John **DILLARD**, et al., Plaintiffs,

v.

**CRENSHAW COUNTY**, etc., et al., **Defendants.**

Civ. A. No. 85–T–1332–N.

United States District Court, M.D. Alabama, N.D.

Oct. 21, 1986.

---

James U. Blacksher, Wanda J. Cochran, Blacksher, Menefee & Stein, P.A., Mobile, Ala., Terry G. Davis, Seay & Davis, Montgomery, Ala., Deborah Fins, Julius L. Chambers, NAACP Legal Defense Fund, New York City, Larry Menefee, Edward Still, Reeves & Still, Birmingham, Ala., Reo Kirkland, Jr., Brewton, Ala., for plaintiffs.

D.L. Martin, Moulton, Ala., and David R. Boyd, Balch & Bingham, Montgomery, Ala., for Lawrence County and Larry Smith defendants.

Barry D. Vaughn, Proctor and Vaughan, Sylacauga, Ala., for Talladega Co. defendant.

Yetta G. Samford, Jr., Samford, Denson, Horsley, Pettey, Martin & Barrett, Opelika, Ala., for Lee Co. defendant.

Rick Harris, Moore, Kendrick, Glassroth, Harris, Bush & White, Montgomery, Ala., for Crenshaw Co. defendant.

John A. Nichols, Lightfoot, Nichols & Smyth, Luverne, Ala., for defendants-intervenors.

Robert Black, Hill, Hill, Carter, Franco, Cole & Black, Montgomery, Ala., for defendants Tate, Smith & Harbin of Crenshaw Co.

W.O. Kirk, Jr., Carrollton, Ala., for Pickens Co. defendant.

Jack Floyd, Floyd, Keener & Cusimano, Gadsden, Ala., for Etowah Co. defendant.

Warren Rowe, Rowe, Rowe & Sawyer, Enterprise, Ala., for Coffee Co. defendant.

Herbert D. Jones, Jr., H.R. Burnham, Burnham, Klinefelter, Halsey, Jones & Cater, Anniston, Ala., for Calhoun Co. defendants.

James W. Webb, Webb, Crumpton, McGregor, Schmael & Wilson, Montgomery, Ala., and Lee M. Otts, Otts & Moore, Brewton, Ala., for Escambia Co. defendants.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

The issue before the court in this lawsuit, premised on section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973, is whether the court should adopt on an interim or permanent basis the proposed redistricting plans submitted by three Alabama counties. Calhoun, Lawrence, and Pickens Counties submitted the plans to cure the section 2 violations in their present schemes for electing their county commissions.

For reasons that follow, the court concludes that Calhoun County's and Lawrence County's plans are due to be accepted in part and rejected in part, and that Pickens County's plan is due to be rejected in its entirety, with the plaintiffs' plan for Pickens County adopted in its place.

### I.

This class-action lawsuit was brought as a challenge to the at-large systems used by nine Alabama counties in electing county commissioners.[1] The plaintiffs, black citizens in the nine counties, contended that the use of the at-large systems violated section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973.

Three of the original nine counties reached full settlement with the plaintiffs in the early stages of the litigation.[2] On May 28, 1986, the court granted preliminary injunctive relief against five of the six remaining counties; the court required that, pending a final hearing on the merits, the five counties must develop new plans that comply with section 2 and must submit

---

1. The nine counties are Calhoun, Coffee, Crenshaw, Escambia, Etowah, Lawrence, Lee, Pickens, and Talladega Counties.

2. The three counties that reached early settlement are Crenshaw, Escambia, and Lee Counties.

the plans to the court in sufficient time for approval and implementation by January 1, 1987.[3] In the memorandum opinion accompanying the preliminary injunction order, the court found, among other things, that there was a substantial likelihood that the plaintiffs would prevail on their section 2 claim against the five counties. *Dillard v. Crenshaw County (Dillard I)*, 640 F.Supp. 1347 (M.D.Ala.1986).

Since the May 28 preliminary injunction, three more counties have reached full settlement with the plaintiffs, and the remaining three counties have reached partial settlement.[4] The three counties reaching partial settlement are Calhoun, Lawrence, and Pickens Counties. The partial settlement is in the form of stipulations, in which the three counties agreed that their "present over-all forms of county government, which includes election of associate commissioners and a commission chairman at-large, currently results in dilution of black voting strength in violation of Section 2." The stipulations further provided, however, that the counties did not admit that "the at-large election of a county commission chairman, in and of itself, necessarily is violative of Section 2." The stipulations required that the counties draft remedial redistricting plans and submit them to the United States Attorney General for consideration for preclearance under section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973c. According to the stipulations, the counties are also to submit the plans to the court and, if by September 30, 1986, the Attorney General has not precleared the plans, the court is to consider whether the plans should be adopted on an interim basis for primary and general elections to be conducted in November and December 1986. While not stated in the stipulations, the parties also agreed that, if a plan is precleared, the court should then consider whether the plan should be adopted on a permanent basis for the upcoming elections.

Calhoun, Lawrence, and Pickens Counties drafted new redistricting plans and submitted them to the court and the Attorney General pursuant to the stipulations. In order to expedite matters for the impending elections, the court held a hearing on the plans on September 5 and 6 to determine whether they should be adopted on an interim or permanent basis after September 30, depending on whether the plans had been precleared by that date.

As of the date of this memorandum opinion, Calhoun County has obtained section 5 preclearance of its plan, but Lawrence and Pickens Counties have not yet heard from the Attorney General. The court must therefore decide whether Calhoun County should be allowed to adopt its plan on a permanent basis, and whether Lawrence and Pickens Counties should be allowed to adopt their plans on an interim basis, that is, until the Attorney General has ruled on the plans.

## II.

*Calhoun County.* This county has a population of approximately 119,761, 17.60% of whom are black. Its current county commission consists of two part-time associate commissioners and a full-time chairperson, all elected at-large. The plan proposed by Calhoun County consists of five part-time associate commissioners from single-member districts and an additional, full-time sixth commissioner to serve as chairperson and county administrative officer, elected at-large. The plaintiffs agree to the redistricting lines and the election procedures for the five associate commissioners; they object, however, to a sixth commissioner elected at-large.

*Lawrence County.* This county has a population of approximately 30,170, 16.82% of whom are black. Under its current election scheme, it has four associate commissioners and a fifth chairperson commission-

---

**3.** The five counties that are subject to the preliminary injunctive relief are Calhoun, Coffee, Etowah, Lawrence, and Talladega Counties.

**4.** The three additional counties reaching full settlement are Coffee, Etowah, and Talladega Counties.

er, all elected at large. Unlike the associate commissioners, the chairperson commissioner is a full-time officer of the county. The redistricting plan proposed by Lawrence County has five associate commissioners elected from single-member districts and a sixth nonvoting, full-time commissioner to serve as chairperson elected at-large. The plaintiffs have two principal objections to Lawrence County's plan: first, they object to the sixth commissioner elected at-large; and, second, they object to the location of an unpopulated industrial park in a predominantly white district rather than in a predominantly black district.

*Pickens County.* This county has a population of approximately 21,481, 41.80% of whom are black. The current county commission consists of four associate commissioners elected from single-member districts in primary elections and elected at-large in general elections. The county probate judge, who is elected at-large, serves as chairperson of the commission and chief administrator of the county.

The plan proposed by Pickens County would redistrict the county into four single-member districts, with the four commissioners running by single-member districts for both primary and general elections; the plan, however, retains the probate judge serving as chairperson and elected at-large. The plaintiffs object to the plan's having a chairperson elected at-large and only four single-member districts.

### III.

The plaintiffs make essentially two arguments in support of their objections to each county's plan. First, they contend that the plan does not fully cure the section 2 violation in the current scheme for electing the county commission. Without question, the remedy fashioned by a court should reach the nature and scope of the violation found. *Upham v. Seamon,* 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982) (per curiam). Second, the plaintiffs contend that the plan itself constitutes a section 2 violation. They correctly observe that, in deciding whether to adopt a plan, a court should

determine whether the plan complies with section 2. *Edge v. Sumter County School District,* 775 F.2d 1509 (11th Cir.1985) (per curiam).

A violation of section 2, as amended in 1982, is established if official action was taken or maintained with a racially discriminatory "intent," *Dillard I,* 640 F.Supp. at 1353, or the action has racially discriminatory "results," determined according to certain Congressionally approved criteria. *Thornburg v. Gingles,* ── U.S. ──, 106 S.Ct. 2752, 2759-60, 92 L.Ed.2d 25 (1986). A results claim is established where the "totality of the circumstances," 42 U.S.C.A. § 1973(b), reveals that "because of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." *Thornburg,* ── U.S. at ──, 106 S.Ct. at 2763, *quoting* S.Rep. No. 417, 97th Cong. 2nd Sess. 28, *reprinted in* 1982 U.S. Code Cong. & Ad.News, 177, 206 (hereinafter S.Rep.). Factors typically considered in evaluating a results claim are:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education,

employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

■ whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

■ whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.* at 2759–60, *quoting* S.Rep. at 28–29, 1982 U.S.Code Cong. & Ad.News, 205–206.

The compilation of these factors is premised on the notion "that a certain electoral law, practice or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg,* —— U.S. at ——, 106 S.Ct. at 2764–65. These factors are therefore neither comprehensive nor exclusive, and other factors may also be relevant and may be considered. *Id.* at ——, 106 S.Ct. at 2764. Furthermore, there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other. *Id.* Rather, "the question whether the political processes are 'equally open' depends upon a searching evaluation of the 'past and present really,' " *id. quoting* S.Rep. at 30, and "on a 'functional' view of the political process." *Id. quoting* S.Rep. at 30 n. 120, 1982 U.S.Code Cong. & Ad.News at 208.

■ However, while the test for a results claim is "flexible" and "fact-intensive," *Thornburg,* —— U.S. at ——, 106 S.Ct. at 2764, there are significant limits.

The first is that at-large schemes are not *per se* violative of a minority group's rights. *Id.* Second, a minority group has no automatic right under section 2 to proportional representation; "the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone does not establish a violation." *Id.* Rather, as already stated, the plaintiffs must show that, under the totality of circumstances, the challenged electoral scheme results in an unequal access to the electoral process.

## IV.

### A.

■ Applying the preceding section 2 precepts, the court agrees with the plaintiffs that the plans submitted by Calhoun, Lawrence, and Pickens Counties, to the extent the plans contain a chairperson elected at-large, do not fully cure the section 2 violations in the three counties' current schemes for electing their county commissions. Admittedly, the stipulations of a section 2 violation entered into by the three counties did not reach the election of the chairperson at-large in the present electoral schemes. However, the evidence before the court establishes that the presence of the at-large chairperson violates section 2's results test.

*First,* in its May 28 memorandum opinion, this court demonstrated that from the late 1880's to the present the State of Alabama and its political subdivisions have "openly and unabashedly" discriminated against their black citizens by employing at different times such devices as the poll tax, racial gerrymandering, and at-large elections, and by enacting such laws as the anti-single-shot voting laws, numbered places laws, and the Sayre law. *Dillard I,* 640 F.Supp. at 1356–59. Without question, the present depressed levels of black voter participation in Calhoun, Lawrence, and Pickens Counties may be traced to these historical devices and laws.

*Second,* in its May 28 memorandum opinion, this court also found historic discrimi-

nation in all areas of the economic and social life of Alabama blacks, including in education, employment, and health services. *Dillard I,* 640 F.Supp. at 1359–60. The evidence now before the court reflects that this discrimination has resulted in a lower socio-economic status for Alabama blacks as a group than for whites, and that this lower status has not only given rise to special group interests for blacks, it has depressed levels of black voter participation and has thereby hindered the ability of blacks to participate effectively in the political process and to elect representatives of their choice to the associate and chairperson positions on county commissions in Calhoun, Lawrence, and Pickens Counties.

*Third,* Calhoun and Lawrence Counties have a majority-vote requirement for primary elections for their county commissions. There is also a numbered post requirement for the commissions. The evidence reflects that these two requirements in conjunction with the at-large election requirement have served as a substantial— indeed, the court is convinced insurmountable—political barrier to the ability of black voting minorities to elect candidates to the associate and chairperson positions in the two counties. Pickens County conducts only its general election on an at-large basis with numbered posts. The evidence reflects that this scheme has also severely impaired the ability of blacks in that county to elect candidates of their choice.

*Fourth,* the black populations of Calhoun, Lawrence, and Pickens are each politically cohesive and a geographically insular minority group.

*Fifth,* the evidence reflects that racially polarized voting in Calhoun, Lawrence, and Pickens Counties is severe and persistent, and that this bloc voting has severely impaired the ability of blacks in the three counties to elect representatives of their choice. Without question, the high percentage of whites unwilling to vote for black candidates in contested elections has, in the usual course of events, resulted in the defeat of those candidates, and would

result today in the defeat of any black candidates who ran for an associate or chairperson position on a commission in the three counties.

*Sixth,* white candidates have encouraged voting along racial lines in Calhoun, Lawrence, and Pickens Counties by appealing to racial prejudice. These appeals have ranged in style from the subtle to the overt, and their clear effect in the racially polarized climate has been to lessen in substantial measure the opportunity of black citizens to participate effectively in the political process and to elect candidates of their choice. Indeed, the court is convinced that these conditions have effectively wiped out any realistic opportunity for county blacks to elect their candidate to an associate or chairperson in the three counties.

*Finally,* the over-all success of black candidates, either local or state, in Calhoun, Lawrence, and Pickens Counties has been, with the exception of "cuing," nil. *McMillan v. Escambia County, Fla.,* 638 F.2d 1239, 1241 n. 6 (5th Cir. February 19, 1981) (discussing "cuing"). Indeed, a black person has never been elected to either an associate or chairperson position on a commission in any of the three counties.

The court is convinced from the above circumstances that for each of the three counties the current requirement for at-large associate commissioners and the requirement for an at-large chairperson commissioner, together and separately, violate section 2. Each of these requirements, in conjunction with the social, political, economic, and geographic conditions described above, has effectively denied the black citizens of each county an equal opportunity to participate in the political process and to elect candidates of their choice. The evidence is clear and convincing that due to the at-large requirement and these conditions the black citizens of each county cannot elect a candidate of their choice to either an associate *or* chairperson position on the commission of that county; this court would have to shut its eyes to reality, past and present, to find otherwise. Any effective cure for this section 2 violation in

the present electoral schemes in the three counties must therefore reach not only the at-large associate commissioner but the chairperson position as well in each of the counties. The plans submitted by the three counties do not do this.

The court also agrees with the plaintiffs that Calhoun, Lawrence, and Pickens Counties' new redistricting plans themselves violate section 2 under the results test. As already stated, the social political, economic, and geographic conditions described above persist today. The court is convinced the at-large chairperson feature in the plans, in conjunction with these conditions, would continue to deny the black citizens of the counties an equal opportunity to participate in the political process and to elect candidates of their choice.

The three counties nonetheless suggest that the court should approve the at-large chairperson feature in their plans in spite of the strong disadvantage the feature places on the black citizens of the counties. They argue that the chairperson must be elected at-large because the position is like that of probate judge, sheriff, and district attorney. The comparison is inapposite, however, because the probate judge, sheriff, and district attorney are among those "single-position" offices which perform judicial and executive functions solely; the chairperson of the county commission, on the other hand, is a member of a body that performs both legislative and executive functions, and which makes decisions only by voting as a body. An at-large elected member would increase the voting membership of the county commission, would participate as a member of the commission, and would exercise enhanced powers enjoyed by no other member of the commission. To that extent, the members elected by a racially fair district election method would have their voting strength and influence diluted.

It is suggested that the chairperson be a non-voting member of the commission or that the chairperson be removed from membership on the commission entirely. This proposal fundamentally alters the form of government for the county in a way that is unprecedented elsewhere in Alabama. It would also dilute black voting strength by depriving the other commissioners of the practical political powers that commissioners normally enjoy. Just at the time that the Voting Rights Act affords blacks an equal opportunity to elect candidates of their choice to the county commission, the persons they are able to elect would end up with less practical political influence than that of their previously at-large elected counterparts. Important day-to-day political power would be transferred to a single person, who would be elected by the very at-large majority vote system that this court has declared unlawful because it impermissibly dilutes black voting strength.

In Alabama, county commissioners and school board members are by state policy different from strictly executive or judicial officials, and they are different from officials elected under a mayor-council municipal form of government. In a mayor-council form of government, the executive and legislative functions are almost entirely separated: The mayor is the executive and the council members are the legislators or policy makers. The city-commission form of government, where the commissioners exercise both executive and legislative powers, is more like county commissions and school boards. If this court were to adopt a remedial plan that created a chairperson for the county commission whose sole functions were to preside at meetings and carry out administrative or executive duties, it would be establishing a form of government virtually unprecedented among county commissions in Alabama.

It also is significant that there is no compelling state policy for the creation of the chairperson sought by the counties. Many county commissions in Alabama operate satisfactorily under systems where they appoint or adopt some other mode of selecting their presiding officers and full-time chief administrators. The three counties here have not advanced reasons why a similar system would not operate satisfac-

torily in their counties, particularly at a time when it appears that elections will finally have become racially fair.

In conclusion, if the court were to approve the at-large chairperson feature in the face of the present social, political, and economic condition in the counties, the court would in effect be adopting plans containing a public office completely beyond the reach of the counties' black citizens and thus reserved exclusively for the white citizens of the counties; this result would be intolerable under section 2 where, as here, there are alternative electoral schemes that could effectively serve the interests of the counties and are also racially fair.

## B.

■ The court has an alternative basis for rejecting the at-large chairperson feature in Lawrence County's plan. As previously stated, section 2 prohibits electoral schemes that not only "result" in impermissible discrimination, but also those that are the product of "intentional" discrimination. The court is convinced that the at-large chairperson feature in Lawrence County's plan is a product of intentional discrimination by Lawrence County.

At the September 5 and 6 hearing before this court, the county engineer for Lawrence County testified that the chairperson of the commission and a number of the associate commissioners stated to him, in substance, that it did not matter if a black person were elected or appointed to the commission because the black person "would not have any say so in the commission." The court believes that the inclusion of the at-large chairperson in Lawrence County's plan was a part of the county commission's racially discriminatory scheme to make sure that any black person elected to the commission would have as little authority on the commission as possible, and that but for the discriminatory scheme Lawrence County would not have adopted the feature.

■ Admittedly, where an electoral scheme adopted in the distant past is a product of intentional discrimination and the court is relying principally on historical evidence to prove discrimination, a plaintiff must show some present day adverse impact to prevail. *Dillard I,* 640 F.Supp. at 1354, 1360–61 & n. 7. However, where the plaintiff's lawsuit comes in the wake of the adoption of an intentionally discriminatory scheme, the plaintiff need not show present day adverse effect to prevail. *See City of Port Arthur v. United States,* 459 U.S. 159, 168, 103 S.Ct. 530, 536, 74 L.Ed.2d 334 (1982) ("even if the 4–2–3 electoral scheme might otherwise be said to reflect the political strength of the minority community, the plan would nevertheless be invalid if adopted for racially discriminatory purposes"); *Buskey v. Oliver,* 565 F.Supp. 1473, 1484 (M.D.Ala.1983) ("even though a redistricting plan may accurately reflect the voting strength of a minority group, it is still invalid if it was adopted for a racially discriminatory purpose").

Here, since the plaintiffs are challenging a recent redistricting plan, they need not actually show that the plan would adversely affect the blacks in the county; they need only show, as they have shown, that it was drafted and adopted by the county for racially discriminatory reasons. The plaintiffs have nonetheless also shown, as discussed in subsection A, that Lawrence County's plan would also have clear and severe adverse racial effect on the black citizens of the county.

## C.

■ The plaintiffs have another objection to Lawrence County's plan. The plaintiffs request that the court redraw the district lines to move an unpopulated industrial park from a predominantly white district to a predominantly black district; the plaintiffs argue that the location of the park in the predominantly white district was racially motivated. The plaintiffs argument is meritless. It appears that the industrial park is jointly owned by and is a product of a joint effort of the county commission and a city in the predominantly white district; it reasonably follows that

**298**

the park should be in the same district as the city that owns it and is responsible for its development. The evidence failed to establish that the location of the industrial park in the predominately white district was racially motivated.

### D.

■ The plaintiffs have another objection to Pickens County's plan. The county's plan has four single-member districts, two of which the county contends will have black populations of 56% and 63% respectively. The plaintiffs maintain that the plan violates section 2. The court agrees.

While the plan proposed by Pickens County may have two districts with black majorities, the credible and reliable evidence clearly reflects that these two districts do not have black voting age majorities. The court is convinced that, in light of the previously discussed social, economic, and political conditions in Pickens County, the plan does not provide a political process that is equally open to both blacks and whites in the county and that reasonably allows the county blacks an opportunity to elect candidates of their choice. *Jordan v. Winter*, 604 F.Supp. 807 (N.D.Miss.) (three-judge court), *affirmed sub nom. Mississippi Republican Executive Committee v. Brooks*, 469 U.S. 1002, 105 S.Ct. 416, 83 L.Ed.2d 343 (1984); *see also id.*, 469 U.S. at 1003, 105 S.Ct. at 416 (Stevens, J., concurring).

### V.

Calhoun County's and Lawrence County's plans can be easily modified to cure their objectionable feature. The court will require for each plan that the chairperson position be eliminated, and that the position of chairperson rotate among the associate commissioners on a regular basis. With this change, each county's scheme for electing the county commission will no longer serve as an obstacle to the equal opportunity of the county blacks to participate in the political processes; the black citizens of each county will be better able to participate in the political process on a equal basis and to elect candidates of their own choice, including candidates who if elected by them will share equally with other commissioners the position of chairperson of the commission. The plan for Calhoun County will be implemented on a permanent basis, and the plan for Lawrence County will be implemented on an interim basis.

■ Because Pickens County's plan is unacceptable in its entirety, and in light of the fact that elections for the commission are to take place within the next two months, this court must come up with a new plan for Pickens County immediately. The plaintiffs have submitted a plan that divides the county into five single-member districts, with the chairperson rotating among the five commissioners; also, two of the districts have black populations of 64.36% and 65.86% respectively and thus have clear black voting majorities. The plaintiffs' plan for Pickens County does not violate section 2; rather, in the face of the previously discussed conditions in the county, it effectively allows the county blacks an equal opportunity to participate in the political process. The court will require that Pickens County implement the plaintiffs' plan on an interim basis.

### VI.

■ Finally, any plan approved and adopted by this court on an interim or permanent basis must comply with the one-person, one-vote requirements of the U.S. Constitution. Calhoun County's and Lawrence County's plans, as modified, meet these requirements. The new Pickens County plan adopted by the court today also meets these requirements. An appropriate judgment and injunction will therefore be entered by the court adopting and implementing the plans as indicated.

### JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That the Calhoun County defendants' October 8, 1986, motion to approve remedial plan is granted in part and denied in part;

(2) That the new redistricting plan submitted by the Calhoun County defendants is approved on a permanent basis, except to the extent that it provides for a sixth chairperson commissioner elected at-large;

(3) That the Calhoun County defendants are ENJOINED and RESTRAINED:

(A) From using the "at-large sixth commissioner" feature of the redistricting plan;

(B) From failing to implement immediately on a permanent basis the redistricting plan submitted by said defendants to the court, with the exception of the "at-large sixth commissioner" feature; and

(C) From failing to have the chairperson position in their plan rotated among the five associate commissioners;

(4) That the new redistricting plan submitted by the Lawrence County defendants is approved on an interim basis, except to the extent that it provides for a sixth chairperson commissioner elected at-large;

(5) That the Lawrence County defendants are ENJOINED and RESTRAINED:

(A) From using the "at-large sixth commissioner" feature of the redistricting plan;

(B) From failing to implement immediately on an interim basis the redistricting plan submitted by said defendants to the court, with the exception of the "at-large sixth commissioner" feature; and

(C) From failing to have the chairperson position in their plan rotated among the five associate commissioners;

(6) That the new redistricting plan submitted by the Pickens County defendants is rejected in its entirety;

(7) That the single-member district plan, consisting of five associate commissioners with the chairperson position rotating among the associate commissioners, submitted for Pickens County by the plaintiffs is approved; and

(8) That the Pickens County defendants are ENJOINED and RESTRAINED from failing to implement immediately the plaintiffs' plan on an interim basis.

It is further ORDERED that the Calhoun County, Lawrence County, and Pickens County defendants are ENJOINED and RESTRAINED from failing to conduct elections for all positions under the plans prior to January 1, 1987, with the elected officials to take office on January 1, 1987.

The clerk of the court is DIRECTED to issue a writ of injunction.