John DILLARD, et al.,
Plaintiffs-Appellees,

v.

CRENSHAW COUNTY, ALABAMA,
etc., Defendants,

Calhoun County, Alabama qua County, Arthur C. Murray, in his official capacity as Probate Judge, R. Forrest Dobbins, in his official capacity as Circuit Clerk, Roy C. Snead, Jr., in his official capacity as Sheriff of Calhoun County, Defendants-Appellants.

No. 86–7799.

United States Court of Appeals,
Eleventh Circuit.

Nov. 2, 1987.

Herbert D. Jones, Jr., Burnham, Klinefelter, Halsey, Jones & Cater, P.C., Anniston, Ala., for Calhoun Co. and Snead, Dobbins and Murray.

William Bradford Reynolds, Asst. Atty. Gen., Jessica Dunsay Silver, Irving Gornstein, Steven H. Rosenbaum, U.S. Dept. of Justice, Civil Rights Div., Washington, D.C., for amicus curiae.

Larry T. Menefee, James U. Blacksher, Blacksher, Menefee & Stein, P.A., Mobile, Ala., Edward Still, Birmingham, Ala., for Dillard, et al.

Before JOHNSON and CLARK, Circuit Judges, and EATON,[*] Senior District Judge.

JOHNSON, Circuit Judge:

This case is about the Calhoun County Commission and whether an at-large chairperson would violate the Voting Rights Act of 1965, in particular Section 2 as amended in 1982.[1] Plaintiffs in this case originally brought suit against nine county governments in Alabama.[2] Six of the counties reached full settlement by the time of the district court's final order. The United States District Court for the Middle District of Alabama approved in part and modified in part the election schemes separately proposed by the remaining three counties. *Dillard v. Crenshaw County*, 649 F.Supp. 289 (M.D.Ala.1986). Calhoun County, the only county pursuing appeal, contests the district court's modification of its five-commissioner and one-chairperson proposal.[3]

---

[*] Honorable Joe Eaton, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. Congress passed the Voting Rights Act pursuant to the enforcement clauses of the Fourteenth and Fifteenth Amendments. *See United States v. Marengo County Comm'n*, 731 F.2d 1546 (11th Cir.1984).

2. The nine counties are Calhoun, Coffee, Crenshaw, Escambia, Etowah, Lawrence, Lee, Pickens, and Talledega counties.

## I. BACKGROUND

The governing commission for Calhoun County was established by a local act in 1939. The 1939 Act provided for a three-member commission of two associate commissioners and a chairperson, all elected at-large from the whole county.[4] The Act did not specify the duties of the chairperson, but provided that the chairperson would receive twice the salary of the associate commissioners. All three members had full and equal voting power. From that general statutory scheme, the Calhoun County Commission evolved into a body that met twice monthly. The position of the chairperson became a full-time commitment with administrative duties in addition to the full legislative powers.

There has never been a black county commissioner in Calhoun County. The black population of Calhoun County is 17.6% overall, and 15.9% of the voting population. As found by the district court, blacks in the county are on average educationally and economically less advanced than whites. The black community is politically cohesive and geographically insular. Voting is racially polarized.[5]

Black plaintiffs, claiming that at-large commissioner elections in conjunction with racially polarized settings resulted in barriers to black participation in the political process, brought this case to force compliance with the Voting Rights Act of 1965. The district court granted a preliminary injunction against the at-large county governments, *Dillard v. Crenshaw County*, 640 F.Supp. 1347 (M.D.Ala.1986), resting the opinion on an extensively documented history in Alabama government of racial

---

3. The United States filed amicus briefs in support of Calhoun County's position.

4. Despite the at-large election, each associate commissioner was resident in and representative of one of two districts created by the 1939 Act.

5. 649 F.Supp. 289, 292–95.

discrimination and on continued adverse impact of that discrimination. All parties in the litigation subsequently agreed and stipulated that

> the present over-all form of county government, which includes election of associate commissioners and a commission chairman at-large, currently results in dilution of black voting strength in violation of Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973.[6]

The district court invited constitutional alternatives from each county. Calhoun County responded with a one-page proposal to increase the membership of its county commission but to retain the position of an at-large chairperson. The new commission would have five associate commissioners, each elected by a single district. One of the five single-member districts would have a 65% voting majority of blacks, allowing a likely result of one black associate commissioner on the full commission. The proposal did not specify the respective duties and powers of the associate commissioners and the chairperson.

The Calhoun County proposal received preclearance by the United States Attorney General, as authorized by Section 5 of the Voting Rights Act. The district court then reviewed the proposal and concluded that

> [a]n at-large elected member would increase the voting membership of the county commission, would participate as a member of the commission, and would exercise enhanced powers enjoyed by no other member of the commission. To that extent, the members elected by a racially fair district election method would have their voting strength and influence diluted.

*Dillard v. Crenshaw County,* 649 F.Supp. at 296. The district judge rejected the at-large chair position, and in its place enjoined the county to rotate the chair amongst the five associate commissioners.

---

**6.** Calhoun County explicitly reserved the right to try to show "full and equal access to the political process by remedial election plans that may

Calhoun County requests this Court to reinstate its original provision for a chairperson chosen at large.

The issue before this Court is whether the at-large position, as proposed by Calhoun County and regulated by state law, in combination with the racial facts and history of Calhoun County, fails to correct the original violation of amended Section 2 of the Voting Rights Act of 1965. This is a case where on review this Court must consider if any findings below were clearly erroneous. *Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982). It is also a case where the district court is vested with broad equitable powers. *United States v. Paradise,* —— U.S. ——, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987). These two factors in combination call for considerable deference to the election plan mandated by the district court. However, this is also a case where the remedy must be narrowly tailored only to include measures necessary to cure the defect. *Upham v. Seamon,* 456 U.S. 37, 42–43, 102 S.Ct. 1518, 1521–22, 71 L.Ed.2d 725 (1982). To the extent that a Section 2 claim must undergo fact-intensive review, *Thornburg v. Gingles,* —— U.S. ——, 106 S.Ct. 2752, 2764, 92 L.Ed.2d 25 (1986), this case requires a careful look at the contentious elements of the proposed plan.

## II. ANALYSIS

To evaluate the at-large provision in the Calhoun County proposal we begin with the language of Section 2:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color. . . .

---

contain a chair, administrator or county executive elected at-large by voters of the entire county."

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C.A. § 1973 (West Supp.1986). Congress amended Section 2 explicitly to overrule *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), in which the Supreme Court extended application of the discriminatory intent requirement for equal protection violations to a challenge under the Voting Rights Act.[7] Thirty pages of legislative history make eminently clear that Congress did not want the high burden of proof for discriminatory intent to govern violations under Section 2.[8] Reverting the standard to its original intent and application, Congress explicitly incorporated a "result" standard into Section 2:

> If as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice, there is a violation of this section. To establish a violation, plaintiffs could show a variety of factors....

S.Rep. No. 417, 97th Cong., 2d Sess. 28, *reprinted in* 1982 U.S.Code Cong. & Admin.News 177, 206 [hereinafter 1982 U.S. Code Cong.].

Congress listed nine typical factors to consider. *Id.* With that imprimatur, the district court in this case looked to the Congressional list and made seven findings that together and separately "reach[ed] not only the at-large commissioner but the chairperson position as well": 1) the history of open and unabashed discrimination in Alabama politics, 2) the lower socioeconomic status of blacks and the corresponding lack of effectiveness in politics, 3) the majority-vote plus numbered-post requirements that together with an at-large election created an insurmountable barrier to electing black candidates, 4) the insularity of the black community, 5) strong racial polarization in voting, 6) appeals to racial prejudice in election campaigns, and 7) the failure of blacks to be elected to office in Calhoun County. 649 F.Supp. at 294–95. The district court concluded that "the evidence before the court establishes that the presence of the at-large chairperson violates Sections 2's results test." *Id.* at 294.

It is clear that any proposal to remedy a Section 2 violation must itself conform with Section 2. *Edge v. Sumter County School Dist.,* 775 F.2d 1509, 1510 (11th Cir.1985). In making the remedy evaluation, the district court again relied on the Congressional list of factors. In essence, the court took the findings that made the original electoral system infirm and transcribed them to the new electoral system. In effect, the court held that once the election of a chair at-large was found unacceptable, no combination of factors would make it acceptable. 649 F.Supp. at 297. However, such a transcription does not end the evaluation.

---

**7.** Proof of discriminatory intent became an explicit requirement for Fourteenth Amendment violations in *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (employment discrimination), and *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (housing discrimination). This Court's predecessor reconciled those cases with the original version of Section 2 by applying the intent requirement. *Bolden v. City of Mobile,* 571 F.2d 238 (5th Cir.1978). The Supreme Court agreed with the application but reversed the Fifth Circuit's finding of circumstantial evidence of discriminatory intent.

**8.** The Supreme Court solidified this interpretation of amended Section 2 in *Thornburg v. Gingles,* —— U.S. ——, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). *Thornburg* extensively defines the extent of vote dilution, bloc voting, and racial polarization that constitutes Section 2 violations. *See also United States v. Marengo County Comm'n,* 731 F.2d 1546 (11th Cir.1984) (explaining application of amended Section 2).

The evidence showing a violation in an *existing* election scheme may not be completely coextensive with a *proposed* alternative. The nine factors suggested by Congress rely to a significant degree on a review of the history *as tainted by* the infirm election procedure. Additionally, a number of these factors are circumstantial, not direct, evidence of a lack of openness in the political process. Thus, at-large procedures that are discriminatory in the context of one election scheme are not necessarily discriminatory under another scheme. The Supreme Court has repeatedly said that at-large procedures are not unconstitutional per se. *Rogers v. Lodge*, 458 U.S. 613, 617, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012 (1982); *Fortson v. Dorsey*, 379 U.S. 433, 439, 85 S.Ct. 498, 499, 13 L.Ed.2d 401 (1965).

▮ To find a violation of Section 2, there must be evidence that the new plan denies equal access to the political process. *Whitcomb v. Chavis*, 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971). But this is not to be confused with equal participation: "[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C.A. § 1973(b). The clearest statement by Congress was the adoption of a test developed and applied by the federal court system in nearly two dozen cases prior to the amendment:

> The court should exercise its traditional equitable powers to fashion the relief so that it *completely* remedies the prior dilution of minority voting strength and *fully* provides equal opportunity for minority citizens to participate and to elect candidates of their choice.

1982 U.S.Code Cong. at 208 (emphasis added). Beyond general maxims, there is very little specific guidance in the legislative history as to the proper evaluation of remedial schemes for violations under amended Section 2.

▮ This Court holds that the district court was not clearly erroneous in finding the seven factors it listed as proof of Section 2 violations.[9] But the five-member, one-chair commission proposal for Calhoun County must be assessed in "the totality of the circumstances." § 1973(b). We must evaluate the new system in part measured by the historical record, in part measured by difference from the old system, and in part measured by prediction. The district court transferred the historical record but incompletely assessed the differences between the new and old proposals.[10]

Calhoun County distinguishes the new chairperson from the old chairperson as different in role and power. Although unspecified in the official proposal, Calhoun County has since emphasized that the commission chairperson would have only a limited legislative role. The chairperson would preside over the commission meetings, but would have no vote except in the case of a tie.[11] Calhoun County emphasizes that the major function of the chairperson would be as county administrator. The implication is that legislative positions are subject to Section 2, but administrative positions are not. Calhoun County argues this distinction without basing it in the language and meaning of Section 2. As it is, the distinction has no direct roots in the legislation.

▮ Nowhere in the language of Section 2 nor in the legislative history does Con-

**9.** Neither Calhoun County nor the United States in its amicus briefs contests the findings.

**10.** Specifically, it appears that the district court assumed the chairperson to be a sixth commissioner and to hold more significant legislative power on the commission than the chairperson was in fact designed to have. 649 F.Supp. at 296. The record before this Court is clear that the chairperson formally has no vote except in the case of a tie. Calhoun County stipulates that, despite former practice, the chairperson's legislative power would extend no further than

presiding over commission meetings and tie breaking. Thus our review of the chairperson inspects a position functionally more executive— and allegedly more separate from the body of associate commissioners—than the position the district court appeared to assess.

**11.** This provision is derived from the general state law for county commissions. Code of Alabama § 11–3–20 (1975). Of course, for the Calhoun County structure, this represents minimal power because the commission has five full voting members.

gress condition the applicability of Section 2 on the function performed by an elected official. The language is only and uncompromisingly premised on the fact of nomination or election. Thus, on the face of Section 2, it is irrelevant that the chairperson performs only administrative and executive duties. It is only relevant that Calhoun County has expressed an interest in retaining the post as an electoral position. Once a post is opened to the electorate, and if it is shown that the context of that election creates a discriminatory but corrigible election practice, it must be open in a way that allows racial groups to participate equally.[12] However, the election of the chairperson should not be assessed in a vacuum, but rather in its full context. Therefore, we go beyond the plain reading of the statute to substantiate the infirmity of the chair position proposed by Calhoun County.

By underscoring the administrative functions of the new chairperson, Calhoun County argues additionally that the new chair position is a single-member office not subject to proportional representation issues. As administrator, the chairperson is likened to sheriffs, probate judges, and tax collectors. For these positions, at-large, non-proportional elections are inherent to their nature as single-person officers elected by direct vote. *Butts v. City of New York*, 779 F.2d 141, 148–49 (2d Cir.1985). Such single offices are most commonly limited to non-legislative functionaries. To the extent that the proposed chair position is not purely executive or judicial, Calhoun County further cites the examples of lieutenant governors and vice presidents. These, too, are single-office positions, and although the offices are executive, they include the authority to preside over legislative bodies and break tie votes. Calhoun County contends that the chairperson of the county commission would be indistin-

guishable in role and, therefore, would not be subject to vote dilution concerns.

Calhoun County draws the analogy to other single-member offices too tightly. Both historically and practically, the overlap between the roles of the commission and the chairperson do not allow us to consider this office as a separate, single-office position. The comparison with lieutenant governors and vice presidents is inapposite to the extent that the chairperson is more directly tied to the work of the county commission than any vice president or lieutenant governor is tied to the work of the legislature. As one indicator, the county chairperson has broad discretion in appointments for carrying out the prescribed work of the county, including services and construction projects. Even in the executive tasks, the chairperson would have greater discretion and power vis-á-vis the legislative body than is typical for lieutenant governors or vice presidents.

Our concern with the scope of the chairperson's duties goes further. Close scrutiny of the proposed duties of the chairperson raises doubt as to the legislative/administrative distinction Calhoun County makes with fervor. The following duties of the chairperson appear in the record:

—resolving citizens' complaints about county services,

—representing the county on various local and state boards,

—lobbying the county's interests to the legislature,

—overseeing county construction projects,

—liaising with military installations in the county, and

—assuring the execution of commission policies by other county officers.

---

**12.** In that Calhoun County, through testimony from community members, has stressed the need for a central county executive, the option of hiring a county administrator remains. This unelected position would not be subject to the Voting Rights Act. However, such a hired executive would by nature be subject to greater control by the Commission, in contrast to the chairperson currently envisioned by Calhoun County. At the very least, it would be inappropriate for such staff to chair commission meetings and break tie votes. Raising this alternative, however, implicates the desire of Calhoun County to retain more than only executive functions in the hands of the proposed chairperson.

The administrative duties of the new chairperson are intended to be a continuation of the administrative duties of the original chairperson. There is no formal enumeration of duties, and this crucial aspect of the proposal comes only from testimony by a member of the current government as a report on the duties of the chairperson from the *original* three-member commission.

County commissions typically join legislative and executive responsibilities. The original commission did not separate legislative tasks. The historical role of the chairperson did not turn on a legislative/executive distinction, and it is doubtful that an unambiguous and fully adhered to line can be drawn.[13] Although many of the functions of the chairperson may be administrative, there is a fine line between legislative and administrative duties. A search for a definition of what constitutes legislative and what constitutes executive activity in government invariably leads to the conclusion that there is no bright line between the two realms.[14] Even as stated in the record, some of the chairperson's duties verge on and possibly over the line. Were this not the crux to keep the chair position within constitutional bounds, this true line would not be so crucial. As it is, however, the ambiguity is more likely fatal.

This Court cannot authorize an element of an election proposal that will not with certitude *completely* remedy the Section 2 violation. The history that brought this case to this Court is a commission which over time skewed power heavily into the hands of the chairperson. Enough of the elements remain to allow anew unacceptable gravitation of power to the chairperson. The full-time/part-time difference between the chairperson and associate commissioners makes significant influence of the chairperson over legislative decisions— even without a vote—inherent to the practice of the commission. The fact that there is no legislative or judicial source that controls the authority of the commission over the chairperson in this electoral scheme, and no local or state statute to fill the gap, compels our decision. In the absence of a judicially approved itemization of chairperson duties and mandated delimits, the proposal from Calhoun County requires a leap of faith by this Court that is simply not buoyed by the history of the Calhoun County Commission.

## III. CONCLUSION

The district court was not clearly erroneous in the seven factors it found to substantiate a Section 2 violation in the original county commission. The district court appropriately considered those same factors in evaluating the proposed county commission. We have reconsidered the an-

---

**13.** In tension with this alteration of duties is Calhoun County's position that under the new plan, the power of the chairperson "stays where it has always been."

**14.** Even on a constitutional level, where the separation is of utmost significance, there is, at the margin, great, and perhaps purposeful, ambiguity as to the separate realms. Despite the "separation" of branches for the system of checks and balances, the drafters of the Constitution did not attempt to delineate the exact functions of each branch. *J. Nowak, R. Rotunda & J.N. Young, Constitutional Law* 136 (2d ed. 1983). Those cases which have required the Supreme Court to draw lines between the legislative and executive branches of government have tended to state the division in generalities and then use discretion to decide the particular case. *Springer v. Philippine Islands,* 277 U.S. 189, 202–03, 48 S.Ct. 480, 482, 72 L.Ed. 845 (1928) (if not legislative or judicial, then it must be executive); *cf.* 277 U.S. at 212, 48 S.Ct. at 486 (Holmes and Brandeis, JJ., dissenting) (responding that also clearly not executive and therefore must "fall into indiscriminate residue of matters within legislative control"). The question has most often arisen in the context of the respective appointment and removal powers of the Congress and the President. *Humphrey's Executor v. United States,* 295 U.S. 602, 628, 55 S.Ct. 869, 874, 79 L.Ed. 1611 (1935) (FTC as quasi-judicial and quasi-legislative); *Myers v. United States,* 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926) (postmaster purely executive). In this area, the bounds of the executive and legislative remain unclear. Note, *In Defense of Administrative Agency Autonomy,* 96 *Yale L.J.* 787, 794 (1987). Two more recent cases speak at length to the division. *INS v. Chadha,* 462 U.S. 919, 952, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (whether legislative depends not on form but on character and effect of matter); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

ticipated role of the new chairperson. Although the extent of the chairperson's legislative power is said by Calhoun County to be minimal, we are not satisfied that the chairperson will be sufficiently uninfluential in the activities initiated and in the decisions made by the commission proper to be evaluated as a single-member office. Furthermore, amended Section 2 does not distinguish between roles within a commission. Given that the chairperson would be elected and would work directly within the context of the elected body of associate commissioners, we agree with the district court that "the members elected by a racially fair district election method would have their voting strength and influence diluted." 649 F.Supp. at 296.

The district court was correct to reject the at-large chair position as proposed by Calhoun County. However, several alternatives remain, including the rotating system leading to this appeal, the option of a hired executive, or perhaps a clearly delimited job description along with other safeguards that would guarantee *no* infringement on the work of the associate commissioners. In keeping with the appropriate role of the district court to fashion a narrowly and well tailored remedy, *Wyche v. Madison Parish Police Jury*, 635 F.2d 1151, 1163 (5th Cir. Unit A Feb. 1981), the district court may consider proposals made in light of this opinion. We REMAND either for reaffirmation of the rotating chairperson system or for approval of a proposed alternative that fully preserves the elected integrity of the body of associate commissioners.