James L. **BUCHANAN, et al., Plaintiffs,**

v.

The **CITY OF JACKSON,
TENNESSEE, et al.**

No. 77–1022.

United States District Court,
W.D. Tennessee, E.D.

Feb. 5, 1988.

Richard Dinkins, Nashville, Tenn., and Napoleon B. Williams, Jr., Legal Defense Fund, New York City, for plaintiffs.

Harold Johnson, Jackson, Tenn., and William S. Rhyne, Washington, D.C., for defendants.

## OPINION AND ORDER REJECTING DEFENDANTS' FIRST PROPOSED REMEDY

TODD, District Judge.

### I. BACKGROUND

On January 5, 1988, the court filed a Memorandum Opinion and Order holding

that the present system of at-large election of the Jackson, Tennessee, Board of Commissioners resulted in a denial or abridgement of plaintiffs' and other black persons' right to vote on account of race or color in violation of § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 *et seq.* Defendants were enjoined from holding further elections under the current system, pending further orders of this court. Mem.Op. at 50–51.

On January 28, 1988, a hearing was held concerning the appropriate remedy in this action. The parties presented evidence, and defendants submitted for the court's consideration a plan for electing commissioners which they contend satisfies the requirements of the Voting Rights Act.

The defendants' plan consists of a nine-member commission. All nine members would wield the legislative power, while the administrative power would be shared by three of the nine commissioners. The three-member administration, or Administrative Commissioners, would be elected at-large; the six additional District Commissioners would be elected from single-member districts. Retained in the proposed plan is the requirement that each commissioner receive a majority of the votes cast for his or her position, along with the corresponding runoff election procedure.

The Board of Commissioners has enacted a resolution specifically amending the City Charter to effectuate this plan, to become effective upon the entry of a final order in this litigation or on July 1, 1991, whichever is later.

The defendants contend that the proposed plan cures the Voting Rights Act violation in that, as drawn, the six single-member districts provide blacks a realistic opportunity to elect representatives of their choice. Two of the six districts are so-called "safe" black districts, with black populations of over 65% under the 1980 U.S. Census of Population. A third district, slightly over 40% black under the 1980 census, is expected to have a majority of black residents under the 1990 census figures. The percentage deviation (the sum of the largest positive and the largest negative deviations) from strict mathematical equality of the six districts is 13.2%.

The plaintiffs are opposed to defendants' proposed plan. Their position is that any plan which perpetuates the maintenance of at-large seats, whether administrative or legislative, cannot completely remedy the Voting Rights Act violation. Further, plaintiffs contend that the retained run-off provision makes the proposed plan an inadequate remedy. At-large elections, however, are not *per se* unconstitutional. *Wise v. Lipscomb,* 437 U.S. 535, 541, 98 S.Ct. 2493, 2498, 57 L.Ed.2d 411 (1978). Further, run-off elections, without more, do not violate either the Constitution or the Voting Rights Act. *See Butts v. City of New York,* 779 F.2d 141 (2d Cir.1985). The task of the court is to determine whether this particular plan is appropriate under the circumstances of this case.

## II. APPLICABLE LAW

The role of the court in fashioning a remedy for a violation of the Constitution was clearly delineated by the Supreme Court in *Wise v. Lipscomb, supra.* The Court stated:

> [R]edistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt. When a federal court declares an existing apportionment scheme unconstitutional, it is therefore, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan. The new legislative plan, if forthcoming, will then be the governing law unless it, too, is challenged and found to violate the Constitution.
>
> Legislative bodies should not leave their reapportionment tasks to the federal courts; but when those with legislative responsibilities do not respond, or the imminence of a state election makes it impracticable for them to do so, it becomes the "unwelcome obligation" of the federal court to devise and impose a

reapportionment plan pending later legislative action.

437 U.S. at 539–540, 98 S.Ct. at 2496–97. (citations omitted). The court has a similar role in fashioning a remedy for a violation of the Voting Rights Act. Where the legislative body proposes a plan which is not unconstitutional or otherwise illegal, a federal court must defer to that legislative judgment, even if it is not the plan the court would have chosen. *Seastrunk v. Burns*, 772 F.2d 143, 151 (5th Cir.1985).

The court must not, however, defer blindly to legislative prerogative. There are clear standards which must be applied in deciding whether defendants' proposed plan is acceptable under the Voting Rights Act.

> The court should exercise its traditional equitable powers to fashion the relief so that it *completely* remedies the prior dilution of minority voting strength and *fully* provides equal opportunity for minority citizens to participate and to elect candidates of their choice.

*Dillard v. Crenshaw County, Ala.*, 831 F.2d 246, 250 (11th Cir.1987) (quoting 1982 U.S.Code Cong. & Admin.News 177, 208) (emphasis added by 11th Circuit). As the Supreme Court has recently stated,

> A district court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar discrimination in the future. Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.

*United States v. Paradise*, 480 U.S. ——, 107 S.Ct. 1053, 1073, 94 L.Ed.2d 203 (1987) (quotations and citations omitted).

Although "nothing in [the Voting Rights Act] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population," 42 U.S.C. § 1973(b), it is clear that any proposal to remedy a § 2 violation must itself satisfy § 2. *Dillard*, 831 F.2d at 249. Furthermore, the court "cannot authorize an element of an election proposal that will not with certitude *completely* remedy the Section 2 violation." *Id.* at 252.

The court previously found that the current system of electing the Board of Commissioners of the City of Jackson violates § 2 of the Voting Rights Act. The court must now determine whether the remedy proposed by defendants violates § 2. In making this determination the court recognizes that

> [t]he evidence showing a violation in an *existing* scheme may not be completely coextensive with a *proposed* alternative. The nine factors suggested by Congress rely to a significant degree on a review of the history *as tainted by* the infirm election procedure. Additionally, a number of these factors are circumstantial, not direct, evidence of a lack of openness in the political process. Thus, at-large procedures that are discriminatory in the context of one election scheme are not necessarily discriminatory under another scheme. The Supreme Court has repeatedly said that at-large procedures are not unconstitutional per se.
>
> . . . .
>
> ... We must evaluate the new system in part measured by the historical record, in part measured by difference from the old system, and in part measured by prediction.

*Dillard*, 831 F.2d at 250 (citations omitted).

## III. ANALYSIS

### A. THE PROPOSED PLAN

The defendants' proposed remedy is a so-called "6–3" plan. Under the plan, the Board of Commissioners would consist of nine members. Six District Commissioners would be elected from single-member districts. Three members, designated as Administrative Commissioners, would be elected at-large. The plan retains a majority vote requirement and a run-off election procedure.

The six District Commissioners would exercise purely legislative functions. The three Administrative Commissioners would have the specific duties that are set forth in the City Charter, as well as the same legis-

lative duties as the six District Commissioners.

The duties of the Administrative Commissioners would be the same as under the current system, except that they would be subject to the control and supervision of a nine-member Board as opposed to the current three-member body. The Mayor (Commissioner of Public Affairs, Revenue and Public Safety) is the City's Chief Executive Officer. Subject to the supervision of the Board, he has, among other duties, "general supervision and oversight over all departments and offices of the City." He has control over all City employees not assigned by the Board to some other department. He has charge of and supervision over all accounts and records of the City and accounts of all officers and departments. He is responsible for the training and equipping of the police force, and is in charge of both the police and fire departments, "subject to the supervision and control" of the Board.

The Commissioner of Streets, Health and Sanitation and Public Improvements is, subject to the supervision and control of the Board, in charge of all streets within the City. He is responsible for the enforcement of all laws relating to public health and sanitation, and has supervision and control of all other health officers and City employees in his department, as well as the City Engineer. He is in charge of the construction, cleaning and repairing of all streets and improvements, and controls the location of such public services as telegraph and telephone wires and poles.

The Commissioner of Education, Parks, Recreation and Public Property, also subject to the control and supervision of the Board, is in charge of maintaining the Jackson public school system, and has control over all employees and facilities thereof. He has charge and control of the public park system, and supervises the entire Recreational Department. He has control of all public buildings and public property, and is responsible for maintaining an adequate insurance program for such property.

Again, these specific administrative powers would be in addition to the Administrative Commissioners' full legislative duties.

### B. HISTORY OF OFFICIAL DISCRIMINATION AND EXTENT OF ITS EFFECTS

■ The court previously found a history of official discrimination in Jackson under the current system. The proposed plan obviously has no history as yet. However, a plan to remedy a violation of § 2 of the Voting Rights Act must, so far as possible, eliminate the effects of past discrimination. *United States v. Paradise*, 480 U.S. ——, 107 S.Ct. 1053, 1073, 94 L.Ed.2d 203 (1987). The effects of past discrimination include, among other things, under-employment of blacks as City employees, poorly maintained streets in black communities, and the total absence of blacks elected to City administrative positions or appointed to head any department. Many of these areas are controlled by the City administration; therefore, the election of *all* Administrative Commissioners at-large would not remedy the effects of this past discrimination. *See League of United Latin American Citizens v. Midland Independent School District*, 648 F.Supp. 596, 601 (W.D. Tex.1986), *aff'd* 829 F.2d 546 (5th Cir.1987).

### C. USE OF UNUSUALLY LARGE ELECTION DISTRICTS, MAJORITY VOTE REQUIREMENTS, ANTI–SINGLE SHOT PROVISIONS, AND OTHER VOTING PRACTICES

In applying this factor to a proposed remedy for a § 2 violation, the appropriate inquiry is the extent to which the City *proposes* to use such practices under the remedial plan.

#### 1. *Size of the Election Districts*

■ The defendants' proposed plan features six small, compact districts for the election of the purely legislative District Commissioners. These six small districts would be advantageous to black candidates because the expense of mounting a campaign throughout a large area would be decreased. However, the most important

members of the Board, the Administrative Commissioners, would still be elected at-large by the entire City. With regard to these positions, black candidates would face the same difficulties in being elected as under the current system.

### 2. *Majority Vote Requirement*

■ As previously stated, the proposed plan retains the requirement that each commissioner receive a majority of the votes cast for his or her position. The requirement would be implemented by a runoff election procedure identical to that under the current system.

In elections for District Commissioners, this requirement would work to the advantage of black candidates in predominantly black districts, and to the advantage of white candidates in districts that are predominantly white. In the at-large elections for Administrative Commissioner seats, however, the majority vote/runoff provision would effectively preclude a black candidate from being elected, thus giving black voters less opportunity than white voters to elect representatives of their choice.

The defendants insist that there is nothing inherently discriminatory in the fact that the three at-large members would perform administrative duties as well as legislative duties, and imply that this is irrelevant. In theory that is true. As the court in *Dillard, supra,* stated:

> It is only relevant that Calhoun County has expressed an interest in retaining the post as an electoral position.

831 F.2d at 251. However, the court did not leave the issue there. It continued:

> Once a post is opened to the electorate, and if it is shown that the context of that election creates a discriminatory but corrigible election practice, it must be open in a way that allows racial groups to participate equally.

*Id.*

The plan proposed by the county in *Dillard* featured five associate county commissioners elected by single districts, and a chairperson elected at-large. The chairperson had no formal vote on the commission except in case of a tie. The county argued that the chairperson was purely an administrator, and therefore his election at-large did not dilute the voting strength of those members elected by racially fair districts. The court refused to accept that argument.

As administrator, the chairperson is likened to sheriffs, probate judges, and tax collectors. For these positions at-large, non-proportional elections are inherent to their nature as single-person officers elected by direct vote. *Butts v. City of New York,* 779 F.2d 141, 148–49 (2d Cir. 1985). Such single offices are most commonly limited to non-legislative functionaries. To the extent that the proposed chair position is not purely executive or judicial, Calhoun County further cites the examples of lieutenant governors and vice presidents. These, too, are single-office positions, and although the offices are executive, they include the authority to preside over legislative bodies and break tie votes. Calhoun County contends that the chairperson of the county commission would be indistinguishable in role and, therefore, would not be subject to vote dilution concerns.

Calhoun County draws the analogy to other single-member offices too tightly. Both historically and practically, the overlap between the roles of the commission and the chairperson do not allow us to consider this office as a separate, single-office position. The comparison with lieutenant governors and vice presidents is inapposite to the extent that the chairperson is more directly tied to the work of the county commission than any vice president or lieutenant governor is tied to the work of the legislature.

831 F.2d at 251.

Under the plan proposed by defendants in the instant case, not only are the Administrative Commissioners tied to the work of the Commission, they are full members of the Board, with exactly the same legislative powers as the six District Commissioners. In addition, most of the administrative duties are broadly discretionary, making the determination of what is administrative and what is legislative even more

ambiguous. Inevitably, power would impermissibly shift into the hands of the Administrative Commissioners, who would have significant influence over the votes of the "part-time" District Commissioners. The District Commissioners would thus have their voting strength and influence diluted, allowing blacks less opportunity than other members of the electorate to participate in the political process. *See Dillard,* 831 F.2d at 251–53.

### 3. *Anti–Single Shot Provisions*

■ As under the current system, the proposed plan has no specific prohibition against single shot voting. However, since all the district elections would be for single members, and all at-large candidates would run for a designated post, there is effectively no possibility of single shot voting.

### 4. *Other Voting Practices*

■ Although prior to 1979 there was only two weeks between the Commission election and any runoff, that period of time was extended to five weeks by a 1979 charter amendment. It would be the same under the proposed plan.

Five weeks is a relatively short, but not unreasonable, interval, and has no appreciable discriminatory effect even though it works to the disadvantage of poorly financed candidates. It would not be feasible to postpone any runoff for a long period of time.

### D. EXTENT OF RACIAL POLARIZATION

■ In its previous Memorandum Opinion, the court discussed at length the evidence presented regarding racial polarization of voting in Jackson. The court found that such racial polarization clearly exists in the current at-large election scheme. There is nothing in defendants' proposed plan to elect all three Administrative Commissioners at-large which would change that result. With respect to the three at-large seats, racially polarized voting would still take place.

### E. CANDIDATE SLATING AND RACIAL APPEALS

In its previous opinion, the court found that black candidates in Jackson had not been denied access to any candidate slating process. The court also found no evidence that political campaigns had been characterized by either overt or subtle racial appeals. There is no reason to believe that these factors would change under the plan proposed by defendants.

### F. EXTENT TO WHICH BLACKS HAVE BEEN ELECTED TO OFFICE

■ Under the current system, no black person has ever been elected to public office in the City of Jackson. Under the proposed plan, two of the six districts have majority black populations and a third is expected to have a majority of black residents under the 1990 census. Thus, it is reasonable to predict that the Board of Commissioners under the proposed plan would have two, and possibly three, black members. However, these black members would be District Commissioners, not Administrative Commissioners.

### G. LACK OF RESPONSIVENESS

■ The court has found that, for approximately fifty of the last seventy years, the Board of Commissioners in Jackson was markedly unresponsive to the needs of the black citizens. This unresponsiveness was caused primarily by the election of City administrators in at-large elections with runoffs. As this feature is retained under the proposed plan, the potential clearly exists for the situation to reoccur.

### H. TENUOUSNESS OF AT–LARGE ELECTION

As the court found previously, the at-large election and runoff provisions of the City Charter are not tenuous. This would not change under the proposed plan. However, as the court stated in its Memorandum Opinion, "[t]hat is not to say, however, that those provisions ... do not have an adverse impact upon the ability of black citizens to elect representatives of their

choice, for clearly they do have such an adverse impact." Mem.Op. at 48.

## I. TOTALITY OF CIRCUMSTANCES

 Under defendants' proposed plan, black citizens would not be denied access to the candidate process, political campaigns would not be characterized by racial appeals, and the use of at-large voting and a runoff procedure would not be tenuous.

However, as the proposed plan features at-large election of all Administrative Commissioners, the effects of past discrimination on black residents of Jackson would not be sufficiently eliminated. Although the six District Commissioners would be elected from small districts, the at-large election of the administrators would still be greatly affected by racially polarized voting. At-large election, a majority vote requirement and runoff provision, and the effective equivalent of an anti-single shot provision would combine to dilute the voting strength of black citizens. Furthermore, the potential would remain for the election of an administration that is unresponsive to the needs of the black community.

An additional feature of the proposed plan which is strongly negative is that it has an effective date of July 1, 1991, at the earliest. As the current system was found to violate § 2 of the Voting Rights Act, implementation of a remedy cannot be delayed until 1991, even though the present Commission may be responsive to the needs of black citizens.

The court concludes, based on the totality of the circumstances, that the method of electing the Board of Commissioners of the City of Jackson under defendants' proposed plan would not be equally open to participation by black citizens in that black citizens would continue to have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

## IV. REMEDY

The plan proposed by the defendants to remedy the present § 2 violation is itself violative of § 2 of the Voting Rights Act of 1965, as amended.

A further hearing will be held on February 26, 1988, at 9:30 A.M., at which time defendants may present a proposed remedy in conformity with this opinion and plaintiffs may present any objections which they might have to the proposed remedy.

IT IS SO ORDERED.