Cornell **WILLIAMS, et al., Plaintiffs,**

v.

**ORANGE COUNTY, FLORIDA, Defendant.**

**No. 90–547–CIV–ORL–19.**

United States District Court, M.D. Florida, Orlando Division.

Jan. 31, 1992.

Johnie A. McLeod, McLeod, McLeod & McLeod, P.A., Apopka, Fla., Gabe H. Kaimowitz, Winter Park, Fla., for plaintiffs.

Arthur Bryant Applegate, Orange County Legal Dept., Orlando, Fla., Edwin John Turanchik, Charles Gilbert Burr, III, Peter Wolfson Zinober, Zinober & Burr, Tampa, Fla., for defendant.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION UNDER FEDERAL RULE OF CIVIL PROCEDURE 56(F)

WATSON, District Judge (sitting by designation).

This is a civil rights action brought under the Voting Rights Act of 1965, 42 U.S.C. § 1973, and the Fourteenth and Fifteenth

Amendments of the United States Constitution. In 1988, the electors of Orange County approved a new form of county government under which six county commissioners are elected from single-member districts and one commissioner who serves as chairperson is elected at-large. The chairperson has both legislative and executive powers. This system is referred to herein as the "6–1" system.

The plaintiffs have been certified as the class of "all black citizens of Orange County, Florida, who were or have been eligible to vote since 1980." They allege that the 6–1 system was enacted with the purpose and effect of diluting the voting power of black electors.

This case is before the Court on defendant Orange County's motion for summary judgment pursuant to Rule 56(c) Fed. R.Civ.P. Plaintiffs oppose the motion and move the Court under Rule 56(f) Fed. R.Civ.P. for additional discovery.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 1973. Plaintiffs' motion under Rule 56(f) is DENIED, and defendant's motion for summary judgment is GRANTED.

The Court, after looking at all the material in the case from the point of view most favorable to plaintiffs, finds nothing beyond the unsupported opinions of plaintiffs to suggest that the adoption of the "6–1" system of election for the Orange County government violated the rights of black voters under the U.S. Constitution or the Voting Rights Act of 1965. Plaintiffs have not come forward with any evidence which would place in factual dispute the proposition, abundantly supported by affidavits, that the "6–1" system was not intended to dilute the black vote and does not in fact operate to dilute that vote.

The 1990 Census now makes it clear that one of the six districts can be drawn so as to have a black voting age majority. This eliminates one of Plaintiffs' original claims. In addition, it is clear that the rights of black voters are not diluted with respect to the at-large election of one County Chairman. Plaintiffs have failed to raise a genuine issue of fact to challenge the persuasive evidence that in elections which are county-wide in Orange County, the white voting majority does not vote as a bloc so consistently that it usually defeats the preferred candidate of black electors. Plaintiffs have entirely failed to create any genuine issue as to the correctness of the expert opinion that in county-wide elections since 1980 the voting preferences of black voters have found strong and meaningful expression.

## BACKGROUND

In November of 1986, the electors of Orange County approved a new home rule charter, which became effective on January 1, 1987. At that time, Orange County commissioners were elected in at-large elections from five residency districts. Section 203 of the Charter provided that "a proposition calling for single-member representation within the Commission districts shall be submitted to the electors of Orange County at the general election to be held in November 1988." Section 702 provided for the appointment of a Charter Review Commission ("CRC") by the Board of County Commissioners ("BOCC") to conduct a comprehensive study of county government and to make proposals for amendments or revisions to the Orange County Charter. *Defendant's Motion for Summary Judgment,* Docket Number 79, Appendix A, *Affidavit of Betty F. Carter,* at 3, and *Orange County Charter,* attached thereto as exhibit 1.

The CRC was created in August 1987 by resolution of the Board of County Commissioners. *Id.* The resolution provided that "Any proposed amendments or revisions to the Charter shall be placed on the ballot ... without the approval of the Board of County Commissioners of Orange County Florida." *Carter Affidavit,* exhibit 2, at 2.

At a meeting on July 15, 1988, the CRC voted (thirteen to two) in favor of placing two propositions on the ballot, worded as follows:

## PROPOSITION 1

### Single–Member County Commission Districts

"Shall the five (5) members of the Orange County Commission of Orange

County, Florida, be elected to the office from single-member districts by electors residing in each of those districts only?"

PROPOSITION 2

Orange County Charter Revision Providing for Six (6) Single–Member Districts, County Chairman, and Other Provisions

"Shall the Orange County Charter be revised increasing the number of County Commissioners from five (5) to six (6); providing for election of each commissioner only by the voters in their commission district; creating the office of County Chairman elected by all county voters and limited to two consecutive terms; specifying legislative and executive functions, powers and duties; revising the initiative process; allowing municipal ordinances to prevail over county ordinance [sic] and making other technical and related changes?"

*Carter Affidavit*, at 4.

Subsequent to approving the ballot issue, the CRC obtained a legal opinion to the effect that if both propositions passed, the result would be the same as if proposition one failed and proposition two passed. *Carter Affidavit*, at 5. Both propositions were submitted to the public at the 1988 general election. Both received a majority of the votes cast. *Defendant's Motion for Summary Judgment*, Appendix F, *Official Cumulative Report, Orange County— General Election November 8, 1988*, at 2, 3. The interpretation of counsel for the CRC was upheld after litigation in state court. The present 6–1 system is the result.

Plaintiffs allege that the 6–1 system dilutes local black voting strength in two ways: by limiting choice for the minority to a legislative office downgraded by the enhancement of the powers of the at-large chairperson, and by limiting the choice of blacks to one of six legislators elected from single-member districts while allowing whites to select two legislators—one from each of their respective election districts and another filled by at-large election in which the black voters of Orange County will have little influence. *Pre–Trial Stipulation, Plaintiff's Contentions*, Docket Number 86, at 13.

Defendant moves for summary judgment, and asserts that there is no genuine issue of material fact that the 6–1 system was not adopted and is not being maintained with invidious intent to discriminate against blacks or to dilute the voting strength of black electors; that Orange County has not intentionally denied blacks the right to register to vote or to cast ballots; that with 1990 decennial census data it is possible to draw the boundaries of one black voting age majority district; and that since 1980, white bloc voting has not usually denied the opportunity to blacks to elect candidates of their choice. *Defendant's Motion For Summary Judgment*, at 2–3.

Plaintiffs respond with *Plaintiffs' Motion Made Pursuant To Rule 56(e) and (f), F.R.Civ.P.*, Docket Number 87, requesting additional discovery prior to adjudication of defendant's summary judgment motion, and *Memorandum Of Law In Support Of Class Plaintiffs' Motion Made Pursuant To Rule 56(e) and (f), F.R.Civ.P., And In Opposition To Defendants' Motion For Summary Judgment*, Docket Number 88, addressing the substance of defendant's motion for summary judgment and requesting that the Court deny summary judgment.

PLAINTIFFS' RULE 56(f) MOTION

■ Plaintiffs' motion under Rule 56(f) requests the Court to defer consideration of defendant's motion for summary judgment and permit plaintiffs to take the depositions of Orange County attorney Tom Wilkes and defendant's expert Michael A. Maggiotto and to file with the court "public documents and news reports to demonstrate past and present intentional racial discrimination."

■ Rule 56(f) states

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the ap-

plication for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

The party opposing the motion for summary judgment by Rule 56(f) must state specific facts explaining its failure to respond to the motion for summary judgment with affidavits showing a genuine issue of material fact for trial. *Barfield v. Brierton,* 883 F.2d 923, 931 (11th Cir.1989). That party may not simply rely on vague assertions that additional discovery will produce needed but unspecified facts, but must indicate how the stay will permit it, through discovery, to rebut the movant's contentions. *Id.* The grant or denial of a continuance is within the sound discretion of the trial court. *Id.*

Plaintiffs' motion is supported only by the affidavit of the attorney for the class, Gabe Kaimowitz. In the affidavit, Mr. Kaimowitz states while preparing for depositions that were taken in late October, 1991, he learned of Mr. Wilkes' role in "preparing the way" for the 6–1 system, including the fact that he served as chairperson of the Citizens Charter Government Study Committee ("CCGSC"). However, Mr. Wilkes is identified as Chairman of the CCGSC and a member of the CRC in a copy of the Orange County Charter filed with this Court on August 30, 1990, as an exhibit to the *Affidavit of Judge Claude R. Edwards, Circuit Judge, retired (Fla.),* Docket Number 43. Yet Mr. Kaimowitz did not attempt to contact Mr. Wilkes concerning a deposition until three days before the November 1, 1991 close of discovery. The Court concludes that Mr. Kaimowitz had ample time to depose Mr. Wilkes and failed to avail himself of the opportunity. Moreover, Mr. Kaimowitz does not indicate in his affidavit how the deposition of Mr. Wilkes would allow him to rebut defendant's motion for summary judgment.

The Kaimowitz affidavit also states that Mr. Kaimowitz did not become aware that defendants had retained an expert to perform an ecological regression analysis of voting patterns in Orange County until October 30, 1991, and submits a copy of defendant's supplemental response to interrogatories numbered 30 and 36 bearing that date. In view of the strategic timing of the supplemental response, it is not surprising that plaintiffs were unable to depose the expert, Dr. Maggiotto.

Mr. Kaimowitz states that given the opportunity to depose Dr. Maggiotto, he would inquire into Dr. Maggiotto's training and expertise in the use of statistics, the justification for the statistical methods Dr. Maggiotto employed in his analysis, and the basis and effect of Dr. Maggiotto's statement that in the 1990 county commission election for district 6, Mable Butler, a Democrat black female defeated Edward N. Rodriguez, a Republican white male.

The Court concludes that the inquiries that Mr. Kaimowitz would have posed to Dr. Maggiotto would not lead to evidence indicating the existence of a genuine issue of material fact. Dr. Maggiotto is a professor of political science, and chair of the political science department of Bowling Green State University. He holds a Ph.D. in political science, and specializes in the study of American political behavior and the use of statistical techniques, including regression analysis, to analyze the behavior of the electorate. He has testified as a voting rights expert in Federal District Courts twice previously, and once in State Court. *Affidavit of Michael A. Maggiotto,* 1–3. The Court finds that there is no genuine issue of Dr. Maggiotto's competence to apply the statistical methods required in this case, and no likelihood that a deposition would raise such an issue.

The statistical methods employed by Dr. Maggiotto, bivariate ecological regression analysis and homogeneous precinct analysis, were relied upon by the Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), and have been used thereafter in many voting rights cases. *E.g. Carrollton Branch of NAACP v. Stallings,* 829 F.2d 1547, 1558 (11th Cir. 1987). The Court concludes there is no likelihood that plaintiffs could raise a genuine issue of the reliability or legal sufficien-

cy of these methods by deposing Dr. Maggiotto.

Mr. Kaimowitz also asserts that he would explore the "error" that Dr. Maggiotto made in referring to Edward N. Rodriguez, the 1990 Republican candidate for county commission district 6 as white, when he is Hispanic. Defendant in response submits the affidavit of Mr. Rodriguez, who states therein that he is white and of Hispanic origin. Defendant's *Response In Opposition To Class Plaintiffs' Motion Made Pursuant To Rule 56(e) and (f), F.R.Civ.P.*, Docket Number 93, Exhibit A. The Court takes judicial notice that it is possible to be both white and of Hispanic origin, and concludes that plaintiffs would not be able to raise a genuine issue of fact material to this case by deposing Dr. Maggiotto concerning the race of Mr. Rodriguez.

More importantly, however, the plaintiff class has utterly failed to give reasons why it cannot come forward with affidavits indicating the existence of a genuine issue of material fact concerning the occurrence of white bloc voting. The statistical methods used by the defense expert are endorsed by case law available to and cited by plaintiffs, and the Orange County voting data it is applied to is a matter of public record. If plaintiffs dispute the use of these methods or data, they have had the opportunity to make the basis for this contention known to the Court and have not done so. Plaintiffs have employed experts of their own in this case [1]. The Court will not speculate about why plaintiffs did not submit the affidavits of those or other experts on these issues. Plaintiffs' lack of access to defendant's expert does not excuse their own failure to submit any affidavits on this essential element of their case in response to defendant's motion for summary judgment.

Plaintiffs' Rule 56(f) motion states that they wish the Court to receive public documents and news reports before summary judgment is considered. *Plaintiffs' Motion Made Pursuant to Rule 56(e) and (f)*, at 2. The motion does not specify any documents beyond those appended thereto. In view of the public nature of the documents, it is obvious that additional discovery would serve no purpose with respect to them. To the extent that the documents that plaintiffs refer to are admissible under Rule 56, there is no reason that they could not have been submitted with their opposition to defendant's motion for summary judgment. The Court therefore will not defer consideration of the motion for summary judgment on that basis.

This case was filed on July 23, 1990. The first interrogatories were served by defendants in September, 1990. Discovery closed on November 1, 1991. Defendant's motion for summary judgment was filed on November 15, 1991. The parties were advised by order of the Court on December 5, 1991 (Docket Number 85) that they would have until December 20 to file affidavits and other documents within the purview of Rule 56, and that failure to oppose the motion may result in judgment for movants without further proceedings.

Plaintiffs have given no reason why, in more than one year of discovery and one month from the filing of the motion for summary judgment, they could not procure affidavits going to the elements of their case. No reason appears why plaintiffs were less able than the defendant to locate individuals who were involved in the political processes leading to the adoption of the 6–1 system and secure their affidavits, or to secure an expert analysis of the public voting records. As a result, the Court concludes that no additional period of discovery is warranted before considering the motion for summary judgment.

---

1. Plaintiffs submitted the affidavit of Professor Mark Stern, a professor of political science, in support of their application for preliminary injunction. *See* Docket Number 38. This affidavit asserted that blacks in Orange County tend to vote for black candidates, and that six single-member county commissioner districts would not be a sufficient number to create a black majority district. This contention is now moot. The affidavit does not address the question of white bloc voting.

Plaintiffs' motion made pursuant to Rule 56(f) is denied. *Plaintiffs' Motion Made Pursuant To Rule 56(e) and (f), F.R.Civ. P.,* and *Memorandum Of Law In Support Of Class Plaintiffs' Motion Made Pursuant To Rule 56(e) and (f), F.R.Civ.P., And In Opposition To Defendants' Motion For Summary Judgment,* and the accompanying affidavit address the merits of defendant's motion for summary judgment and request that the Court deny summary judgment. The Court now proceeds to adjudicate that motion.

## SUMMARY JUDGMENT

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Rule 56(c).* In determining if a factual issue exists, a court must consider all of the evidence in the light most favorable to the non-moving party. *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 (11th Cir.1987). The Rule mandates the entry of summary judgment upon motion, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." Id.

## CONSTITUTIONAL CLAIMS

■ In order to prove at trial that the 6–1 system dilutes the votes of blacks in violation of the Fourteenth Amendment, plaintiffs must show that it was " 'conceived or operated as *[a] purposeful* device to further racial discrimination' by minimizing, canceling out or diluting the voting strength of racial elements in the popula-

tion." *Rogers v. Lodge,* 459 U.S. 899, 103 S.Ct. 198, 74 L.Ed.2d 160 (1982), *quoting Whitcomb v. Chavis,* 403 U.S. 124, 142, 91 S.Ct. 1858, 1877, 29 L.Ed.2d 363 (1971) (emphasis added). To prevail on the claim under the Fifteenth Amendment, plaintiffs must show a purposeful denial of the right to register and to vote or to cast ballots. *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 1498–99, 64 L.Ed.2d 47 (1980). Nowhere do plaintiffs allege that they have been denied the right to register or cast ballots. Defendants have convincingly demonstrated that the 6–1 system was not created and is not operated for a discriminatory purpose. Plaintiffs have failed to respond with any fact indicating the existence of a genuine issue with respect to intentional discrimination.

■ Plaintiffs' complaint refers to a "smoking gun" indicating that the 6–1 system was intentionally created to dilute the voting power of minorities in Orange County. Plaintiffs' *Verified Complaint For Declaratory And Injunctive Relief For A Proposed Class In A Civil Voting Rights Action,* Docket Number 1, at 12. The "smoking gun" is a letter to the Orlando Sentinel written by the chairman of the Orange County Executive Committee ("OCEC"), in 1988. In the letter, Mr. Pugh notes that the OCEC supported the creation of seven single-member districts for county commissioners. He points out that the 1986 charter provision calling for a referendum on single member districts did not mention the idea of a "strong mayor," and states that at public hearings, "no cry for a strong mayor was heard." He then states,

By a slim majority within the Charter Commission, the long awaited single member districts are being bonded to the questionable proposal for a County Executive. And that slim majority will not let the rest of us vote on the issues we want to vote on. Nobody will be allowed, (if the current proposal stands), to vote for the districts without voting simultaneously for the mayor. This is unfair to the voters. It is especially unfair to

those minority communities never represented on the County Commission.

*Defendant's Motion for Summary Judgment,* Appendix F, *Affidavit of Irby Pugh,* Exhibit 2.

It is evident that the proposal referred to in the letter did not stand. As submitted to the electorate, the charter referenda did separate the 6–1 system from a pure single-member district system. Furthermore, a fair reading of the letter reveals that Mr. Pugh criticizes the unfairness of the proposal, but does not impute any discriminatory motive to the CRC or anyone else. Indeed, in an affidavit submitted by defendant, Mr. Pugh states that "My letter to the Orlando Sentinel was not meant to suggest or imply that those individuals who advocated the 6–1 system had any intent, motivation or purpose to dilute the voting strength of blacks in orange county." *Pugh Affidavit,* at 3.

The CRC consisted of fifteen members appointed by individual county commissioners. *Carter Affidavit,* at 4. Two of the members of the CRC, Wilbur Gary and Ronald Rogers, are black. *Defendant's Motion for Summary Judgment,* Appendices C and D, *Affidavits of Wilbur Gary and Ronald O. Rogers.*

Mr. Gary states the following: The CRC began its deliberations in September, 1987. Its initial meetings focused upon organization, staffing and identification of issues. From the outset, it was his intention to work for a system of county government that would assure that at least one black commissioner would be elected to the Board of County Commissioners. He was in favor of an all single-member district system, without firmly advocating any particular size. Between January and May, 1988, he recalls expressing an interest in seven and nine member single-member district systems, including some which included one at-large member. He recalls members of the county commission in early 1988 testifying before the CRC that an all single member district system would not work because it would place too much pressure on district commissioners and would result in ward politics. Representatives

from local governments advocated a strong chairperson, and expressed the need to have an effective leader in charge of county government. Elected black officials and administrators from other Florida counties also appeared and testified about the need to have single member districts to provide for minority representation on the county commission.

Mr. Gary states that in his opinion, the issues surrounding the single member districts, the size of the county commission and the strong chairperson position were the most important issues before the CRC. These issues dominated the debate and discussion of the CRC from early 1988 until the final vote in July, 1988. Initially, the county chairperson position was put forward as one with extraordinary powers, including a veto over legislation passed by the BOCC. However, through a series of votes by the CRC, the powers of the position were progressively diluted, although the strong chairperson still retained the power to oversee the administration of county government. Mr. Gary was opposed to the chairperson concept as originally proposed because he believed that it had too much power. As the powers were progressively diluted and modified, the concept became more acceptable to him.

In the end, Mr. Gary voted for the 6–1 system because he believed it was the best compromise between those who wished to enhance the opportunity for minority representation on the BOCC and those who wanted the greater leadership and accountability of the strong chairperson. As he recalls, there was no member of the CRC who did not favor some type of single member district system, as each appeared to acknowledge its desirability as a means to provide for minority representation on the BOCC. During the ten months of deliberations, Mr. Gary reports that he never heard any CRC member make any disparaging or discriminatory remarks, or hear any member state or imply that he supported election of a chairperson from the at-large seat because of a desire to dilute the influence of a black county commissioner, to disenfranchise blacks, or otherwise

dilute the voting power of blacks in Orange County. Nor does Mr. Gary recall any suggestion from members of the public that the chairperson should be elected county-wide to prevent a black from being chairperson. *Affidavit of Wilbur Gary.*

Mr. Gary concludes by saying

After reflecting about the debate and deliberations of the CRC, I have no reason to believe or even suspect that the CRC voted in favor of the 6–1 system in order to discriminate or dilute the vote of black electors in Orange County. To the contrary, in my opinion, the CRC voted for six single-member districts in order to concentrate or intensify the voting strength of blacks which would make it easier to elect a black to the county commission. In fact, as I recall, the word in the black community was that the 6–1 system would finally allow the election of a black candidate to the county commission.

*Gary Affidavit,* at 4.

Mr. Rogers affidavit corroborates that of Mr. Gary. He states that the representatives of Orange County municipalities recommended a strong chairperson, and that elected officials, members of the black community, and black officials from other jurisdictions testified in favor of a single member district system. He indicates that the majority of the CRC did not favor increasing the number of commissioners to nine, and there was substantial concern about ward politics under such a system. Similarly, Mr. Rogers perceived a significant number of citizens who wanted the accountability and leadership of a county chairperson. About half of the public that appeared during hearings supported the chairperson or "mayor" system, particularly business leaders and elected officials. Mr. Rogers viewed the 6–1 system as a good compromise between the viewpoints of the black community and those favoring a strong chair. Consequently, he voted for the 6–1 proposal. Mr. Rogers states

At no point do I recall any CRC member expressing any interest or intent to dilute the voting power of blacks or otherwise discriminate against blacks. In

fact, the opposite was true. The desire of the CRC appeared to be to increase black voting strength by providing for six single-member districts. I believed that such a system represented a substantial improvement over the former five at-large district commission.

*Affidavit of Ronald O. Rogers.*

It is clear from these affidavits that the 6–1 system developed through an open and democratic process free from bias or prejudice and any intent to discriminate against the plaintiff class.

In the deposition of representative plaintiff Cornell Williams, Mr. Williams stated that he had attended three meetings of the CRC. *Defendant's Motion for Summary Judgment,* Volume I, Appendix K, *Deposition of Cornell Williams,* at 32. When asked if he saw or heard anything taking place during the hearings he attended that suggested that the CRC would act with the purpose of discriminating against blacks or diluting black voting strength, he replied, "I did not hear or see anything that indicated that, but my experience with at-large election indicated that at-large itself would dilute black vote." *Williams Deposition,* at 42. He further stated that no one else had ever told him of any occurrence at CRC meetings that would lead him to believe that the CRC intended to discriminate. *Williams Affidavit,* at 43. His deposition makes clear that his belief is based solely upon the recommendation of the CRC to place the 6–1 system on the ballot.

Representative plaintiff James Mitchell also indicated that he had never heard any of the CRC members say anything that would lead him to believe that the CRC acted with racially discriminatory intent. *Defendant's Motion for Summary Judgment,* Volume I, Appendix L, *Deposition of James Mitchell,* at 32. Like Mr. Williams, it is clear from his deposition that his belief is based solely upon the fact that the system was recommended for the ballot by the CRC. *Mitchell Affidavit,* 33 et seq.

Similarly, representative plaintiff James Jackson stated that he had attended at least one CRC meeting and had neither heard nor heard of any activities of the

CRC that suggested a discriminatory motive, other than the adoption of the 6–1 proposition. *Defendant's Motion for Summary Judgment,* Volume I, Appendix M, *Deposition of James Jackson,* at 28–29.

Mr. Wardell Simms, also a representative plaintiff, stated in deposition that the form of the ballot propositions, and a newspaper report in the Orlando Sentinel at the time of the election that "one cannot win unless you vote for both of them," supported the charge of intentional discrimination. *Defendant's Motion for Summary Judgment,* Volume I, Appendix N, *Deposition of Wardell Simms,* at 16–17. He stated that he had attended "several" of the CRC meetings, *Id.,* at 19, and indicated that he did not hear any of the members of the CRC say anything that suggested that the 6–1 system was being proposed with the intent to discriminate against blacks. *Id.,* at 26. He observed, however, that the CRC allotted time more generously to those speaking in favor of the 6–1 system than those who opposed it. *Id.,* at 27.

■ The Court concludes from the depositions of the representative plaintiffs that they possess no evidence sufficient to raise a genuine question of discriminatory intent in the adoption or maintenance of the 6–1 system. All four representative plaintiffs attended CRC meetings, and only one of the four noticed any activity which he perceived as indicative of a discriminatory intent. Further, that activity (granting more time to speakers who favor the 6–1 system) indicates a preference for the 6–1 system, and does not of itself indicate any racial motive.

While Mr. Simms did not indicate the date of the Sentinel article that he referred to in his deposition, plaintiffs have submitted an Orlando Sentinel article published the week before the 6–1 referendum in support of another motion in this case. The article states

If voters say no to both options, the commission would stay as it is, with all members elected countywide.

But when it came time to explain the choices to voters, commissioners decided they would publish a pamphlet explaining the options instead of letting the charter review committee do it. That is when the latest trouble started. The pamphlet, sent out last week, said that voters had to say yes to both options if they wanted a county mayor. That was wrong: Voters can say no to the first question and yes to the second and still approve the county mayor idea.

*Memo of Law in Support of Plaintiffs' Motion to Disqualify Thomas J. Wilkes, Esq., as an Attorney of Record in These Proceedings,* Exhibit C. Even assuming *arguendo* that another article had erroneously stated that a vote for both propositions was required to approve the 6–1 system, this article was obviously written in part to clear up the confusion. Moreover, the confusion favored the adoption of the five single-member districts, not the 6–1 system. The Court thus determines that plaintiffs have made no showing that they possess any evidence to indicate that the Orlando Sentinel misinformed the Orange County electorate in order to discriminate against black voters.

Because the 6–1 proposal originated with the CRC and passed directly to the ballot without the approval of the BOCC, evidence unrelated to this process is irrelevant to the claim of intentional discrimination. Defendant has shown that there is no genuine issue of intentional discrimination in the creation and operation of the 6–1 system, and plaintiffs have failed to rebut that showing.

## VOTING RIGHTS ACT

■ Section 2 of the Voting Rights Act, as amended, states

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in number equal to their proportion in the population.

In *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the Supreme Court provided an extended analysis of the statute. After a discussion of the nature of the proof required to establish a § 2 violation as elaborated in the legislative history, the Court stated that the circumstances under which such a violation may be proved are limited in three ways.

First, electoral devices, such as at-large elections, may not be considered per se violative of § 2. Plaintiffs must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral process. Second, the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone does not establish a violation. Third, the results test does not assume the existence of racial bloc voting; plaintiffs must prove it.

*Gingles,* 478 U.S. at 46, 106 S.Ct. at 2764. (citations omitted).

More specifically, the use of multimember districts generally does not violate § 2 absent the conjunction of three preconditions:

First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.... Second, the minority group must be able to show that it is politically cohesive.... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed ... usually to defeat the minority's preferred candidate.

*Gingles,* 478 U.S. at 50–51, 106 S.Ct. at 2766–67 (citations omitted).

The election districts at issue in *Gingles* differed from the 6–1 system at bar in that all of the representatives from the contested districts were elected at large. Nevertheless, the *Gingles* preconditions apply to the plaintiffs § 2 claim of voting power dilution based upon the downgrading of the powers of the single-member district commissioners and the inability of blacks to elect the at-large chairperson. *See Houston Lawyers' Assn. v. Attorney General of Texas,* 501 U.S. ——, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991); *see also Dillard v. Crenshaw County,* 649 F.Supp. 289, 293 (M.D.Ala.1986); *affirmed,* 831 F.2d 246, 251–3 (11th Cir.1987).

At the outset of this action, plaintiffs asserted that no black voting age majority district could be drawn under the 6–1 system and sought an order requiring seven single-member districts. Subsequently, the results of the 1990 decennial census have become available. Notwithstanding their failure to stipulate to the fact, the parties have conceded that district six can now be drawn to create a district with a black voting age majority. *Pre–Trial Stipulation, plaintiff's contentions, at 6* ("Blacks do form a majority in one election district under any of the Commission redistricting plans being seriously considered"); *Memorandum in Support of Defendant's Motion for Summary Judgment,* at 6. Plaintiffs' claim that the 6–1 system does not allow such a district is thus moot.

Defendants assert that there is no genuine issue concerning the fact that the white majority in Orange County does not vote sufficiently as a bloc to enable it usually to

defeat the black-preferred candidate. In support of its motion, Orange County submits the affidavit of Dr. Michael Maggiotto, an expert in statistical analysis of voting data, whose qualifications are discussed *supra*. Dr. Maggiotto examined the Orange County voting and registration records for all of the contested County Commission races from 1980 to 1990, *Defendant's Motion for Summary Judgment*, Volume II; all of the contested county offices involving black candidates opposing Anglo-white candidates from 1980–1990; and the 1988 Charter referenda issues. *Affidavit of Michael A. Maggiotto, Defendant's Motion for Summary Judgment*, Appendix H, at 3.

Dr. Maggiotto analyzed this data using two independent statistical methods, homogeneous precinct analysis and ecological regression analysis. These methods were utilized in the *Gingles* case, and are accepted by this Court. Dr. Maggiotto's analyses yielded measures of the percentage of black support and white support for the candidates or issues in these elections summarized in the appendices to this opinion.

From his analyses, Dr. Maggiotto found the following:

Between 1980 and 1990, there was a candidate favored by a majority of black electors in 10 out of 13 county-wide Democratic primary and run-off elections for the office of County Commissioner. In 8 of these 10 elections, the candidate preferred by at least a majority of black electors won. In three of the thirteen elections, no candidate received a majority of black votes.

In county-wide general elections for county commission during the same period, candidates favored by at least a majority of black electors won 6 out of 14 contests. In addition, in the 1980 election for district 3, the black majority preferred candidate lost by 0.27% of the total vote. In 1988, the black majority preferred candidate lost by 0.13% of the total vote. In 1990, the winner of the county-commission chair elected

at large was Linda Chapin, who was preferred by at least a majority of black electors. The results indicate that Ms. Chapin would not have won without the votes of black electors.

In each of the county wide general election contests between 1980 and 1990, at least 90 percent of the black electors voted for the Democratic party candidate.

In 1990, in the county commission district six election, Democrat Mable Butler, a black female, defeated Republican white male[2]. This was a district, rather than county-wide, election.

From the foregoing, *Maggiotto Affidavit*, at 4–5, Dr. Maggiotto opined, *Id.*, at 6,

These results show that it is *not* the case in Orange County, Florida that County Commission candidates favored by at least a majority of black electors are usually defeated by white bloc voting. Quite the contrary, these results show that within the Democratic party, the candidates favored by at least a majority of black electors win most elections. Second, these results show that in general elections, black electors vote overwhelmingly for the Democratic party candidate, and that whenever the Democratic party candidate wins, the black candidate of choice wins. Third, these results indicate that the Democratic party candidates for County Commission won 6 out of 14 county-wide general elections, or 43 percent of the contests, and in two more of these races, the Democratic party candidates came within three-tenths of one percent of winning. Thus, on average, Democratic party candidates for County Commission—the candidates typically supported by large majorities of black electors—have roughly an even chance of winning county-wide general election contests for the County Commission in Orange County, Florida.

Dr. Maggiotto noted that with the exception of Ms. Butler's 1990 election to the BOCC, no black candidates ran for county

2. The Republican white male who defeated Mabel Butler in district six is Edward Rodriguez, a white male of Hispanic origin.

commission between 1980 and 1990. *Maggiotto Affidavit*, at 6. While acknowledging that significant differences between elections for different offices generally limit the probative value of data from elections for offices other than those at issue, Dr. Maggiotto presented the results of his analyses of county-wide elections in Orange County for school board and county judge in which a black candidate faced a white candidate, as follow:

Between 1980 and 1990, there were 7 county-wide elections in which a black candidate ran against one or more white candidates where a nomination was at stake. Six were county-wide primary or run-off elections for school board, and one was a county-wide non-partisan election for judge. In each election, the black candidate received at least a majority of the black electors' votes. The black candidate won six of these seven elections, including the 1980 Republican primary for School Board District 5, in which Kattie Adams, a black female, defeated a white male.

In the same period, there were 8 county-wide elections in which a black candidate ran against one or more white candidates where the outcome determined who would occupy the office. Five of these elections were contests for the school board and three were for judge. In each of these races the black candidate received at least a majority of the black electors' votes. The black candidates won four of these eight elections.

Each general election defeat of a black school board candidate involved a victory for a Republican party candidate. Ms. Adams won the 1980 primary and general school board elections because she received majorities of the black and white votes. In 1988, Ms. Adams ran against James Mitchell, a black male who had run unsuccessfully for the school board in 1980 and 1984. A majority of white electors favored the Republican candidate Adams, and a large majority of the black electors favored the Democratic candidate Mitchell, although there was more cross-over voting than is typical.

Dr. Maggiotto concluded that in general elections in which a black candidate successfully ran against a white candidate, approximately fifty percent of the white electors voted for the black candidate. Black candidates won ten out of fifteen of the local county-wide elections in which they participated in Orange County since 1980, and the candidates preferred by at least a majority of blacks were not typically defeated by white bloc voting.

Dr. Maggiotto also reviewed election data from the 1988 Charter referenda. He concluded that a majority of black electors favored adoption of both referenda, and both referenda passed. Further, the black electors favored passage of both measures by larger majorities than white electors, and the fall-off in support of black electors for the second issue was proportionally the same as the fall-off in support of white electors for the second ballot issue.

Plaintiffs characterize this expert's affidavit as "quite deceiving and in material respects contrary to law and facts." Plaintiff's *Memorandum of Law*, Docket Number 88, at 14. Plaintiffs argue that Dr. Maggiotto's conclusions are erroneous because he referred to Mr. Rodriguez, one of the opponents of Mabel Butler as a "Republican white male" without noting Mr. Rodriguez' Hispanic origin. Plaintiffs cite *Meek v. Metropolitan Dade County*, 908 F.2d 1540 (11th Cir.1990), for the proposition that "the Latino population is not said to be statistically insignificant."

In *Meek*, a blacks and Hispanics brought suit alleging a violation of the Voting Rights Act. In contrast, in this case, no indication of polarized voting with respect to Hispanic origin is before the Court. Moreover, in 1990, 46.8% of the registered voters of district six were black. *Defendant's Motion for Summary Judgment*, Appendix G. Ms. Butler received 11,630 votes, more than twice the 5,430 votes cast for Mr. Rodriguez. Viewed in the light most favorable to plaintiffs, the Court is unable to conclude that Ms. Butler won the 1990 district six county commission election due to the "special circumstance" of Mr. Rodriguez's ethnicity.

In addition, defendant has submitted a supplemental affidavit from Dr. Maggiotto, in which he states,

> Mr. Rodriguez's race and ethnicity is immaterial to the opinions and conclusions I reached in my affidavit with regards to the opportunity black electors have had in Orange County to elect candidates of their choice to at-large positions. This is because my opinions were based on the success rate black electors have had since 1980 in electing county commission candidates of their choice to the county commission as well as the success rate in electing black candidates for other county offices who ran county-wide.

Defendant's *Response In Opposition To Class Plaintiffs' Motion Made Pursuant To Rule 56(e) and (f), F.R.C.P.*, Exhibit C, *Supplemental Affidavit of Michael Maggiotto*, at 2.

■ Plaintiffs argue that the evidence of county commission elections in which no black candidate ran should not be considered. In *Gingles*, 478 U.S. at 67–68, 106 S.Ct. at 2774–75, Justice Brennan, writing for a plurality of the Court, states

> First, both the language of § 2 and a functional understanding of the phenomenon of vote dilution mandate the conclusion that the race of the candidate per se is irrelevant to racial bloc voting analysis.... [T]he fact that race of voter and race of candidate is often correlated is not directly pertinent to a § 2 inquiry. Under § 2, it is the status of the candidate as the chosen representative of a particular racial group, and not the race of the candidate, that is important."

This plurality approach was adopted by the 11th Circuit in *Carrollton Branch of NAACP v. Stallings*, 829 F.2d 1547, 1558 (11th Cir.1987) ("as a plurality of the Supreme Court have held, it is the race of the voter, not of the candidate, which is of concern in racial polarization claims.")

Notwithstanding this language in *Gingles*, the 5th Circuit in *Citizens for a Better Gretna v. Gretna*, 834 F.2d 496 (5th Cir.1987), found that only elections in which black candidates had run could be considered in assessing the degree of racially polarized voting. "[I]mplicit in the *Gingles* holding is the notion that black preference is determined from elections which offer the choice of a black candidate. The various *Gingles* concurring and dissenting opinions do not consider evidence of elections in which only whites were candidates. Hence, neither do we." *Gretna*, 834 F.2d at 503–4.

The *Gretna* approach was followed in *Bradford County NAACP v. City of Starke*, 712 F.Supp. 1523, 1540 (M.D.Fla. 1989). While acknowledging that there is no binding precedent on this issue, *Id.* the *Bradford* Court found support in the following passage from *Solomon v. Liberty County, Fla.*, 865 F.2d 1566, 1573 (11th Cir.1988):

> Between these extremes, however, there will fall situations in which evidence of vote polarization and minority electoral failure is either inconclusive, insufficient, or unavailable due to a lack of minority candidacies. In these cases, the courts must rely on the full range of totality of circumstances inquiries to determine whether the challenged electoral system violates the Act.

The *Solomon* Court stated that this was recognized in *Gingles* when the Supreme Court noted,

> The number of elections that must be studied in order to determine whether voting is polarized will vary according to pertinent circumstances. One important circumstance is the number of elections in which the minority group has sponsored candidates. Where a minority group has never been able to sponsor a candidate, courts must rely on other factors that tend to prove unequal access to the electoral process. Similarly, where a minority group has begun to sponsor candidates just recently, the fact that statistics from only one or a few elections are available for examination does not foreclose a vote dilution claim.

*Gingles*, 478 U.S. at 57 n. 25, 106 S.Ct. at 2769–70 n. 25.

This Court declines to follow *Gretna* and *Bradford*. The quoted passages from *Solomon* and *Gingles* do not compel the con-

clusion that elections in which black candidates did not run cannot be considered. On the contrary, evidence of the lack of black participation in elections in which there were no black candidates would be an important factor that would tend to prove unequal access to the electoral process. Conversely, black participation in such elections is a circumstance relevant to whether the electoral system violates the Act.

Nevertheless, the Court concludes that if this case were a challenge to the five at-large commissioner system that the 6–1 system replaced, the affidavit of Dr. Maggiotto would be insufficient to meet the movant's burden on motion for summary judgment. However, the 6–1 system was developed with the participation of the black community and was proposed in part in an attempt to facilitate minority participation in county government.

In *Dillard v. Crenshaw County, Alabama,* 831 F.2d 246, 250 (11th Cir.1987), the Court considered the relation between a proposed remedy for a county election system in violation of the Voting Rights Act and the election scheme it was to replace:

> The evidence showing a violation in an *existing* election scheme may not be completely coextensive with a *proposed* alternative. The nine factors suggested by Congress rely to a significant degree on a review of the history *as tainted by* the infirm election procedure. Additionally, a number of these factors are circumstantial, not direct, evidence of a lack of openness in the political process. Thus at-large procedures that are discriminatory in the context of one election

scheme are not necessarily discriminatory under another scheme. The Supreme Court has repeatedly said that at-large procedures are not unconstitutional per se.

*Id.* (citations omitted.)

The decision of whether to govern Orange County by an all single-member district system or by the 6–1 system with its at-large chairperson was submitted to the voters. A majority of black voters, as well as white voters, chose the 6–1 system.

Under these circumstances, the facts that whites have not voted as a bloc so as to usually defeat the candidates preferred by blacks in Orange County commission races prior to the adoption of the 6–1 system, nor in Orange County school board and judicial races in which black candidates have run, indicate that the 6–1 system does not dilute the voting power of blacks in violation of § 2 of the Voting Rights Act. The additional facts that a black candidate has successfully run for county commission under the 6–1 system, and that the current county chairperson could not have been elected without the support of black voters bolster this conclusion.

In the face of affidavits demonstrating these facts, and fully cognizant of what they would be required to prove at trial, plaintiffs have failed to produce any substantial evidence raising a genuine issue for trial.

Defendant's motion for summary judgment is GRANTED.

All other pending motions are DENIED.

APPENDIX I

**REGRESSION ESTIMATES OF RACIAL VOTING FOR COUNTY COMMISSION RACES IN ORANGE COUNTY, FLORIDA: 1980–1990**

| Race/Party | Total Votes | Whites | | Blacks | |
|---|---|---|---|---|---|
| | | Support | Adj $R^{2*}$ | Support | Adj $R^2$ |
| 1980 Democratic Primary | | | | | |
| District 1 | | | | | |
| Carter | 16,083 | 41.2 | .12 | 30.2 | .12 |
| Thomas | 14,781 | 35.0 | .42 | 53.5 | .42 |
| Wagner | 9,857 | 23.8 | .10 | 16.2 | .10 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **District 3** | | | | | | |
| Cook | | 8,305 | 23.2 | .00 | 24.7 | .00 |
| Courtney | | 4,829 | 13.6 | .01 | 15.9 | .01 |
| Spears | | 14,577 | 40.4 | .06 | 48.5 | .06 |
| Turley | | 7,975 | 22.9 | .21 | 10.8 | .21 |
| **District 5** | | | | | | |
| Brown | | 3,508 | 8.8 | .25 | 18.1 | .25 |
| Davis | | 10,709 | 30.4 | .09 | 22.9 | .09 |
| Ingham | | 3,947 | 8.7 | .27 | 18.1 | .27 |
| McCree | | 10,169 | 33.0 | .28 | 10.8 | .28 |
| Oropeza | | 1,742 | 2.9 | .66 | 14.9 | .66 |
| Swanson | | 5,776 | 16.1 | .00 | 15.1 | .00 |
| **1980 Democratic Run–Off** | | | | | | |
| **District 1** | | | | | | |
| Carter | | 27,578 | 67.2 | .38 | 46.8 | .38 |
| Thomas | | 14,916 | 32.8 | .38 | 53.2 | .38 |
| **District 3** | | | | | | |
| Cook | | 14,415 | 42.1 | .05 | 35.4 | .05 |
| Spears | | 20,465 | 57.9 | .05 | 64.6 | .05 |
| **District 5** | | | | | | |
| Davis | | 19,287 | 50.4 | .21 | 70.4 | .21 |
| McCree | | 16,539 | 49.6 | .21 | 29.6 | .21 |
| **1980 General Election** | | | | | | |
| **District 1** | | | | | | |
| Carter | D | 71,503 | 55.1 | .63 | 94.5 | .63 |
| LaRue | R | 51,931 | 44.9 | .63 | 5.5 | .63 |
| **District 3** | | | | | | |
| Spears | D | 57,837 | 46.6 | .70 | 95.8 | .70 |
| Martson | R | 58,151 | 53.7 | .70 | 4.2 | .70 |
| **District 5** | | | | | | |
| Davis | D | 56,058 | 44.2 | .68 | 94.2 | .68 |
| Treadway | R | 62,771 | 55.8 | .68 | 4.8 | .68 |
| **1982 Primary Election** | | | | | | |
| **District 2** | | | | | | |
| Clenney | | 1,607 | 5.3 | .11 | 8.9 | .11 |
| Hedrick | | 5,656 | 17.5 | .40 | 30.7 | .40 |
| Keith | | 6,634 | 22.3 | —.01 | 22.7 | —.01 |
| Orr | | 2,249 | 8.7 | .04 | 5.3 | .04 |
| Pins | | 12,441 | 46.1 | .19 | 32.1 | .19 |
| **District 4** | | | | | | |
| Harrell | | 13,542 | 48.4 | .37 | 70.4 | .37 |
| Rigante | | 7,437 | 31.1 | .31 | 9.2 | .31 |
| Pruett | | 5,373 | 20.5 | —.01 | 20.4 | —.01 |
| **1982 Primary Run–Off** | | | | | | |
| **District 2** | | | | | | |
| Keith | | 6,549 | 34.9 | —.01 | 34.7 | —.01 |
| Pins | | 12,245 | 65.1 | —.01 | 65.3 | —.01 |
| **1982 General Election** | | | | | | |
| **District 2** | | | | | | |
| Pins | D | 47,711 | 43.1 | .81 | 92.5 | .81 |
| Dorman | R | 52,742 | 56.9 | .81 | 7.5 | .81 |
| **District 4** | | | | | | |
| Harrell | D | 61,201 | 62.1 | .69 | 94.4 | .69 |
| Rodriguez | R | 33,290 | 37.9 | .69 | 5.6 | .69 |

### 1984 Primary Election

| District 1 | | | | | | |
|---|---|---|---|---|---|---|
| Carter | | 21,780 | 64.6 | —.00 | 67.2 | —.00 |
| Wagner | | 10,313 | 35.4 | —.00 | 32.8 | —.00 |
| District 3 | | | | | | |
| Poole | | 15,836 | 52.2 | .22 | 66.0 | .22 |
| Trivett | | 12,999 | 47.8 | .22 | 34.0 | .22 |

### 1984 General Election

| District 1 | | | | | | |
|---|---|---|---|---|---|---|
| Carter | D | 108,764 | 64.6 | .75 | 93.3 | .75 |
| West | R | 55,201 | 35.4 | .75 | 6.7 | .75 |
| District 3 | | | | | | |
| Poole | D | 63,315 | 34.5 | .87 | 97.4 | .87 |
| Martson | R | 92,345 | 65.5 | .87 | 2.6 | .87 |
| District 6 | | | | | | |
| Brown | D | 55,367 | 28.9 | .89 | 91.5 | .89 |
| Treadway | R | 103,251 | 71.1 | .89 | 8.5 | .89 |

### 1986 Primary Election

| District 4 | | | | | | |
|---|---|---|---|---|---|---|
| Chapin | | 23,456 | 73.6 | —.01 | 73.5 | —.01 |
| Warner | | 8,394 | 26.4 | —.01 | 26.5 | —.01 |

### 1986 General Election

| District 2 | | | | | | |
|---|---|---|---|---|---|---|
| Campbell | D | 46,440 | 30.3 | .84 | 93.9 | .84 |
| Dorman | R | 83,155 | 69.7 | .84 | 6.1 | .84 |
| District 4 | | | | | | |
| Chapin | D | 67,531 | 47.4 | .86 | 95.8 | .86 |
| Borgon | R | 63,986 | 52.6 | .86 | 4.2 | .86 |

### 1988 Primary Election

| District 3 | | | | | | |
|---|---|---|---|---|---|---|
| Herring | | 17,163 | 62.9 | .03 | 67.6 | .03 |
| Misicka | | 9,819 | 37.1 | .03 | 32.4 | .03 |

### 1988 General Election

| District 1 | | | | | | |
|---|---|---|---|---|---|---|
| Carter | D | 83,503 | 49.9 | .78 | 93.5 | .78 |
| Moore | R | 74,438 | 50.1 | .78 | 6.5 | .78 |
| District 3 | | | | | | |
| Herring | D | 81,223 | 47.1 | .87 | 95.1 | .87 |
| Martson | R | 81,448 | 52.9 | .87 | 4.9 | .87 |
| District 5 | | | | | | |
| Hardee | D | 51,435 | 29.3 | .90 | 96.7 | .90 |
| Donegon | R | 95,202 | 70.7 | .90 | 3.3 | .90 |

### 1990 Primary Election

| District 6 | | | | | | |
|---|---|---|---|---|---|---|
| Butler | B | 4,887 | 45.7 | .59 | 79.3 | .58 |
| Hoard | B | 1,341 | 26.9 | .53 | 12.9 | .51 |
| Mills | B | 1,069 | 27.4 | .35 | 7.8 | .35 |

### 1990 General Election

| Commission Ch. | | | | | | |
|---|---|---|---|---|---|---|
| Chapin | D | 76,545 | 49.1 | .82 | 94.1 | .82 |
| Drage | R | 68,626 | 50.9 | .82 | 5.9 | .82 |
| District 6 | | | | | | |
| Butler | D | 11,630 | 44.3 | .96 | 99.2 | .96 |
| Rodriguez | R | 5,430 | 55.7 | .96 | .8 | .96 |

APPENDIX II
## REGRESSION ESTIMATES OF RACIAL VOTING
## IN COUNTY SCHOOL BOARD AND JUDICIAL RACES
## CONTESTED BY BLACK AND WHITE CANDIDATES AND IN RELATED
## CHARTER REFERENDA IN ORANGE COUNTY, FLORIDA: 1980–1990

| Election/ Party | Race | Total Votes | Whites Support | Adj $R^2$ | Blacks Support | Adj $R^2$ |
|---|---|---|---|---|---|---|
| **1980 Republican Primary** | | | | | | |
| School Bd. Dist. 5 | | | | | | |
| Adams | B | 13,955 | 54.6 | .20 | 83.6 | .20 |
| Davies | W | 11,262 | 35.4 | .20 | 16.4 | .20 |
| **1980 Democratic Primary** | | | | | | |
| School Bd. Dist. 6 | | | | | | |
| Mitchell | B | 14,083 | 34.6 | .75 | 85.8 | .75 |
| Berry | W | 10,810 | 39.6 | .59 | 6.3 | .59 |
| Wyman | W | 7,877 | 25.8 | .20 | 7.9 | .20 |
| **1980 Democratic Run–Off** | | | | | | |
| School Bd. Dist. 6 | | | | | | |
| Mitchell | B | 17,640 | 44.0 | .78 | 90.2 | .78 |
| Berry | W | 16,291 | 56.0 | .78 | 9.8 | .78 |
| **1980 General Election** | | | | | | |
| School Bd. Dist. 5 | | | | | | |
| Adams | B | 68,746 | 59.2 | .01 | 54.9 | .01 |
| Kaminsky | W | 45,907 | 40.8 | .01 | 45.1 | .01 |
| School Bd. Dist. 6 | | | | | | |
| Mitchell | B | 46,106 | 66.1 | .84 | 1.5 | .84 |
| Barnes | W | 70,075 | 33.0 | .84 | 98.5 | .84 |
| **1982 Democratic Primary** | | | | | | |
| School Bd. Dist. 1 | | | | | | |
| Baker | B | 10,664 | 29.7 | .79 | 77.6 | .79 |
| Hernandez | H | 7,321 | 40.3 | .47 | 13.0 | .47 |
| Stone | W | 9,866 | 30.0 | .36 | 9.4 | .36 |
| **1982 Democratic Run–Off** | | | | | | |
| School Bd. Dist. 1 | | | | | | |
| Stone | W | 9,183 | 60.7 | .70 | 11.4 | .70 |
| Baker | B | 9,135 | 39.3 | .70 | 88.6 | .70 |
| **1984 General Election** | | | | | | |
| School Bd. Dist. 4 | | | | | | |
| White | B | 57,163 | 31.0 | .89 | 97.9 | .89 |
| Parsons | W | 95,395 | 69.0 | .89 | 2.1 | .89 |
| School Bd. Dist. 6 | | | | | | |
| Mitchell | B | 55,000 | 28.5 | .91 | 99.3 | .91 |
| Barnes | W | 98,711 | 71.5 | .91 | 0.7 | .91 |
| School Bd. Dist. 5 | | | | | | |
| Adams | B | UNOPPOSED | | | | |
| **1986 Democratic Primary** | | | | | | |
| School Bd. Dist. 1 | | | | | | |
| Baker | B | 16,062 | 43.1 | .65 | 80.8 | .65 |
| Stone | W | 15,699 | 56.9 | .65 | 19.2 | .65 |
| **1986 Nonpartisan Primary** | | | | | | |
| County Court Judge | | | | | | |
| Bronson | B | 32,127 | 49.2 | .49 | 81.3 | .49 |
| Kelley | W | 28,597 | 50.8 | .49 | 18.7 | .49 |

### 1986 General Election

**School Bd. Dist. 1**

| | | | | | | |
|---|---|---|---|---|---|---|
| Baker | B | 52,388 | 35.3 | .85 | 98.7 | .85 |
| Gardner | W | 75,935 | 64.7 | .85 | 1.3 | .85 |

### 1988 Nonpartisan Primary

**Circuit Judge, Group 3**

| | | | | | | |
|---|---|---|---|---|---|---|
| Perry | B | 34,472 | 51.5 | .54 | 74.5 | .51 |
| Byrd | W | 28,990 | 48.5 | .54 | 25.5 | .51 |

### 1988 General Election

**School Bd. Dist. 5**

| | | | | | | |
|---|---|---|---|---|---|---|
| Adams | B | 96,849 | 68.6 | .82 | 24.1 | .83 |
| Mitchell | B | 53,100 | 31.4 | .82 | 75.9 | .83 |

### 1988 Charter Issues

**5 Single Mem. Dist.**

| | | | | | |
|---|---|---|---|---|---|
| Yes | 104,293 | 60.5 | .35 | 72.3 | .35 |
| No | 63,126 | 39.5 | .35 | 27.7 | .35 |

**6-1 System**

| | | | | | |
|---|---|---|---|---|---|
| Yes | 93,078 | 55.2 | .24 | 65.5 | .24 |
| No | 72,753 | 44.8 | .24 | 34.5 | .24 |

### 1990 Democratic Primary

**County Comm. Dist. 6**

| | | | | | | |
|---|---|---|---|---|---|---|
| Butler | B | 4,877 | 45.7 | .59 | 79.3 | .58 |
| Hoard | B | 1,341 | 26.9 | .53 | 12.9 | .51 |
| Mills | B | 1,069 | 27.4 | .35 | 7.8 | .35 |

### 1990 Nonpartisan Primary

**County Judge**

| | | | | | | |
|---|---|---|---|---|---|---|
| Golden | B | 27,287 | 36.5 | .80 | 79.8 | .80 |
| Hart | W | 22,797 | 36.5 | .53 | 16.8 | .51 |
| Hefferan | W | 16,590 | 27.0 | .56 | 3.4 | .58 |

### 1990 General Election

**County Judge**

| | | | | | | |
|---|---|---|---|---|---|---|
| Golden | B | 63,240 | 49.2 | .76 | 79.1 | .78 |
| Hart | W | 57,237 | 50.8 | .76 | 20.9 | .78 |

**County Comm.**

| | | | | | | |
|---|---|---|---|---|---|---|
| Butler | B | 11,630 | 44.3 | .96 | 99.2 | .96 |
| Rodriguez | W | 5,430 | 55.7 | .96 | 0.8 | .96 |

\* $R^2$ is a coefficient of determination. Higher values reflect a better fit of the data to the regression analysis. The upper limit is 1.0.